**Bruce Talmadge WHITEHORN,**
**Plaintiff-Appellant,**

v.

**E.L. HARRELSON; Mr. Green; D.**
**Foster, E. Potts, Counselors,**
**Defendants-Appellees.**

**No. 83–7615.**

United States Court of Appeals,
Eleventh Circuit.

April 25, 1985.

Delores R. Boyd, Montgomery, Ala., for plaintiff-appellant.

Jack M. Curtis, Asst. Atty. Gen., Montgomery, Ala., for defendants-appellees.

Before HILL and HENDERSON, Circuit Judges, and WISDOM *, Senior Circuit Judge.

WISDOM, Senior Circuit Judge:

This appeal raises for the first time in the Eleventh Circuit the issue whether a lawfully confined prisoner has a constitutionally protected liberty interest in his continued participation in the Alabama work release program. The district court, apparently reluctantly,[1] granted summary judg-

---

\* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The district court stated that it reached its decision that Whitehorn had no protected liber-

ty interest "with some reluctance" both because the procedures that the defendants followed in revoking Whitehorn's work-release status apparently "contained numerous deficiencies" and because Whitehorn's removal from work release seemed to him "an inordinately severe punish-

ment in favor of the defendants, employees of the Alabama Department of Corrections, holding that the plaintiff, Bruce Talmadge Whitehorn, had no protected interest in participating in the Alabama work release program. The proper inquiry, however, is not whether the plaintiff had a protected liberty interest in his work release eligibility determination, but whether he had a constitutionally protected liberty interest in his continued participation in the Alabama work release program. Because we determine that there are disputed questions of fact material to this issue, we remand for a full trial on the merits.

## I.

In June 1981 Whitehorn was placed in the Alabama work release program[2] and assigned to the Montgomery Work Release Center. He obtained employment at Jane's Home, a licensed home for senior citizens, and remained in its employ until his removal from work release in February 1983. On February 1, 1983, the Department of Corrections removed the plaintiff from the work release center and placed him in the Kilby Correctional Facility. At the time, the Department notified him that he was being transferred pending an investigation by the Department and by the Montgomery Police Department. The notice made no reference to the subject matter of the investigation.

On completion of the investigation, February 4, 1983, the Montgomery Police Department filed no charges against Whitehorn. The Alabama Department of Corrections did, however, serve Whitehorn with a

"Major Disciplinary" charge, alleging that he manipulated the "money policy" in violation of Rule 27 of the Rules for Community Based Residents.[3] On February 9, 1983, a three-member prison disciplinary committee conducted a hearing at which only the police officer who investigated the alleged violation, the plaintiff, and the plaintiff's employer testified. The committee concluded that Whitehorn had violated Rule 27 as charged and it recommended that he lose four months good time, be permanently removed from work release, and be considered for an increase in custody. The work release director concurred in the committee's recommendations.

Whitehorn filed his pro se complaint in the United States District Court for the Middle District of Alabama on June 3, 1983, seeking injunctive relief and compensatory and punitive damages under 42 U.S.C. § 1983 (1982). The complaint alleged that the defendants[4] had unlawfully terminated Whitehorn's participation in the Alabama work release program in violation of the eighth and fourteenth amendments to the United States Constitution. On July 8, 1983, the district court entered an order requesting the defendants to file a special report answering Whitehorn's allegations. The defendants filed the special report with accompanying affidavits on August 8, 1983. By order dated August 11, 1983, the district court converted the defendants' special report to a motion for summary judgment and gave Whitehorn additional time to respond to the motion. Whitehorn filed a timely response including exhibits and

ment" for the violation with which Whitehorn was charged. *See* Order of the District Court dated September 30, 1983, at 3.

2. The record does not reveal the crime for which the plaintiff was convicted, the date of his conviction and sentencing, or the duration or security classification of his prison confinement before he was placed in the work release program.

3. The Rules and Information Handbook for Community Based Residents ECS, dated December 7, 1978, contains a list of 27 major infractions, which could result in removal of a prison-

er from the work release program. The major disciplinary complaint charged that Whitehorn sold several pieces of gold jewelry and failed to report the sale and his receipt of $61.00 for the jewelry to the proper prison authorities. The contemporaneous police investigations carry implications not apparent in the record.

4. The named defendants include: E.L. Harrelson, then director of the Montgomery Community Based Facility; C.S. Greer, Chairman of the February 9, 1982 Disciplinary Committee; and Messers. Foster, Potts, and Green, counselors at the Montgomery Community Based Facility.

affidavits to refute the defendants' factual allegations.

On September 30, 1983, the district court entered summary judgment in favor of the defendants. The court held that Whitehorn could not, as a matter of law, prevail in the action; he had failed to show that he had been deprived of any protected liberty interest. The court stated:

> In order to prevail, plaintiff must first show that he has been deprived of some protected liberty interest. *Wolff v. McDonnell*, 418 U.S. 539, 558 [94 S.Ct. 2963, 2975, 41 L.Ed.2d 935] (1973 [1974]). A protected interest in a work release program will arise if the rules governing the program create an entitlement to participation in the program. This may occur where the rules create objective qualifications for the programs, so that a prisoner looking at the rules might expect himself to be qualified. *Winsett v. McGinnes*, 617 F.2d 996, 1005–06, (3d Cir.1980), *cert. denied*, 449 U.S. 1093 [101 S.Ct. 891, 66 L.Ed.2d 822] (1981). If participation is left to the discretion of the authorities, however, no entitlement arises. *Smith v. Saxbe*, 562 F.2d 729, 734 (D.C.Cir.1977).

Order of the District Court dated September 30, 1983, at 1–2. The court then examined the Alabama statute establishing work release for Alabama inmates, which authorizes the Board of Corrections, at its discretion, to allow inmates "as to whom there is reasonable cause to believe [the Board] will know [the prisoner's] trust" to participate in the work release program. Ala.Code § 14–8–2(a) (1975). The court concluded that the statute did not limit the Board's discretion to determine who would be eligible to participate in the work release program; therefore, the plaintiff had no pro-

tected interest in participating in the program. *Id.* at 2.

In his appellate brief submitted by appointed counsel, Whitehorn asserts that although the district court correctly determined that, in order to prevail, the plaintiff must make a preliminary showing that he was deprived of a protected liberty interest, the court erred in too narrowly circumscribing the source and the nature of the plaintiff's alleged liberty interest. First, Whitehorn contends that the court should have looked not only to the Alabama statute but to the regulations carrying out the statute and to the practices of the prison administration in operating the work release program as well to determine whether any of these sources created a constitutionally protected liberty interest. Second, Whitehorn contends that the relevant inquiry is not whether he had a liberty interest in the initial determination of eligibility for work release, but whether his continuing work release status could be revoked without due process protections. We agree. Accordingly, our inquiry on appeal must be whether the Constitution itself or the State of Alabama, through its statutes, regulations, or practices, has created a liberty interest in a prisoner's continued participation in the work release program.

## II.

■ A section 1983 claim is conditioned on two essential elements: first, the conduct complained of must have been committed by a person acting under color of state law; second, this conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983 (1982)[5]; *see also, e.g., Parratt v. Taylor*, 1982, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420. It is undisput-

---

**5.** Section 1983 provides in full:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

42 U.S.C. § 1983 (1982).

ed that the defendants in the instant case were acting under color of state law in revoking the plaintiff's work release status. As correctly noted by the district court judge, the threshold question in this case, therefore, is whether the plaintiff has been deprived of a liberty or property interest secured by the Constitution or laws of the United States. *See Staton v. Wainwright,* 5 Cir.1982,[6] 665 F.2d 686, 687, *cert. denied,* 456 U.S. 909, 102 S.Ct. 1757, 72 L.Ed.2d 166.

Whitehorn asserts that he was deprived of his right to continued participation in the Alabama work release program without due process of law. He contends that his right to remain in the program derives both from the due process clause itself and from the laws of Alabama.

■ In only a few limited circumstances has the Supreme Court recognized a liberty interest inherent in the Constitution itself in favor of a prisoner whose original confinement was lawful. A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom[7] such that "the loss of liberty entailed [by its revocation] is a serious deprivation requiring that the [prisoner] be accorded due process". *Gagnon v. Scarpelli,* 1973, 411 U.S. 778, 781, 93 S.Ct. 1756, 1759, 36 L.Ed.2d 656. Interests recognized by the Supreme Court that fall within this category include the revocation of parole, *Morrissey v. Brewer,* 1972, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, and the revocation of probation, *Gagnon v. Scarpelli,* 411 U.S. at 778, 93 S.Ct. at 1756. The Court has also recognized a protected liberty interest derived from the due process clause itself when a prisoner is deprived of a liberty interest that was not extinguished upon the prisoner's conviction and sentencing. In *Vitek v. Jones,* 1980, 445 U.S. 480, 100 S.Ct. 1254,

63 L.Ed.2d 552, the Court held that a prisoner has a liberty interest inherent in the Constitution itself entitling him to due process protections before he could be involuntarily transferred from prison to a mental hospital. The Court has consistently refused to recognize liberty interests arising from the Constitution itself in situations involving the alteration of a more conditional right or status afforded a lawfully confined prisoner.

■ The Court's recent decisions emphasize that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the constitution, the Due Process Clause does not in and of itself subject an inmate's treatment by prison authorities to judicial oversight". *Montanye v. Haymes,* 1976, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466; *see also, e.g., Hewitt v. Helms,* 1983, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675. Accordingly, the Court has found no constitutionally based liberty interest in the involuntary transfer of a prisoner to a different prison facility, *Olim v. Wakinekona,* 1983, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813; *Montanye v. Haymes,* 1976, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466; in the transfer of a prisoner from the general prison population to administrative confinement, *Hewitt v. Helms,* 1983, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675; in the transfer of a prisoner from a less restrictive facility to a more restrictive facility, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155; or in the initial determination whether discretionary parole-release should be granted a prisoner, *Greenholtz v. Inmates of Nebraska Penal & Correctional*

---

**6.** The Eleventh Circuit has adopted as precedent all Fifth Circuit decisions rendered before October 1, 1981. *Bonner v. City of Prichard,* 11 Cir.1981, 661 F.2d 1206, 1209.

**7.** Although a parolee or probationer does not enjoy unrestricted freedom, "his condition is very different from that of confinement in a

prison". *Morrissey v. Brewer,* 1972, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484. He can be "gainfully employed"; he is "free to be with his family and friends" and to enjoy other freedoms subject to the conditions of his parole or probation. *Id.*

*Complex*, 1979, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668.

The liberty afforded a prisoner in a work release program falls somewhere in between the less restricted liberties enjoyed by a parolee or probationer and the more restricted status conferred upon prisoners incarcerated within the general prison population.[8] Whitehorn asserts that his loss of work-release status—a status which enables the prisoner to leave the general prison population and allows him some of the same liberties enjoyed by parolees and probationers—is a loss so grievous as to trigger a right to due process protections inherent in the Constitution itself. The Supreme Court has, however, rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause". *Meachum v. Fano*, 427 U.S. at 224, 96 S.Ct. at 2538 (emphasis added). The *Meachum* Court refused to hold that "any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause", because to do so would "subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts". *Id.* at 225, 96 S.Ct. at 2538. Indeed, the Supreme Court has inferred inherent due process protections only in cases in which the prisoner's "release from institutional life altogether" has been revoked, *Hewitt v. Helms*, 459 U.S. at 468, 103 S.Ct. at 869, *see Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 and *Gagnon v. Scarpelli*, 411 U.S. at 778, 93 S.Ct. at 1756; or in cases in which the restrictions imposed go beyond the original conditions of confinement, *see Vitek v. Jones*, 1980, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552. Although the plaintiff in the instant case did enjoy some conditional liberty while participating in the work release program, he had not been released from institutional life altogether. Moreover, his return to the general prison population did not subject him to confinement beyond the sentence initially imposed upon him. Thus, although the Supreme Court has not specifically addressed the issue of revocation of work-release status, the Court's steadfast refusal to expand the scope of liberty interests finding their protection within the fourteenth amendment itself compels us to hold that the plaintiff in the instant case did not enjoy a liberty interest so fundamental as to fall within this category.

Our conclusion on this point finds further support in the law of this and other circuits. In its most recent decision addressing the issue, this court held that the only liberty interests protected by the due process clause are those created through some state action.[9] *Dudley v. Stewart*, 11 Cir. 1984, 724 F.2d 1493, 1497 (*citing Parker v. Cook*, 5 Cir.1981, 642 F.2d 865). Earlier precedents in the Fifth Circuit have recognized constitutionally protected liberty interests not created by state action. *See Jones v. Diamond*, 5 Cir.1981, 636 F.2d 1364, 1374 (en banc), *cert. dismissed*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033. Although the law is not entirely consistent, we may safely conclude that no precedent in this circuit has found a protected liberty interest inherent in the due process clause itself other than those fundamental interests previously recognized by the Supreme Court.

Other circuits have also looked primarily to state law as a source of protected liberty interests. Two circuits have specifically addressed the issue of a prisoner's liberty interest in work release participation and have held that there is no constitutionally mandated liberty interest in the initial work release eligibility determination, *Winsett v. McGinnes*, 3 Cir.1980, 617 F.2d 996, *cert. denied*, 1981, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822; or in a prisoner's contin-

---

**8.** See Comment, *The Federal Prisoner's Right to a Due Process Hearing Before Work-Release Revocation*, 14 U.S.F.L.Rev. 617, 634–38 (1981).

**9.** *But see Hewitt v. Helms*, 459 U.S. at 466, 103 S.Ct. at 869: "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States".

ued participation in work release, *Durso v. Rowe*, 7 Cir.1978, 579 F.2d 1365, *cert. denied*, 1979, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82.[10] Similarly, the Court of Appeals for the First Circuit has held that there is no liberty interest inherent in the due process clause in a prisoner's continued participation in a half-way house program. *Garcia v. DeBatista*, 1 Cir.1981, 642 F.2d 11, 14.[11]

The decisions of the Supreme Court and the circuit courts, therefore, make clear that the plaintiff in the instant case can succeed on the merits of his claim only if the State of Alabama has created a constitutionally protected liberty interest in his continued participation in the work release program.

### III.

■ In granting summary judgment for the defendants in the instant case, the district court examined only the Alabama statute authorizing and establishing the state's work release program and concluded that the statute did not create a prisoner's entitlement to participation in the program. The court did not distinguish between an initial determination of work release eligibility and the revocation of work release status. The plaintiff argues on appeal that the critical inquiry in this case is not whether he had an entitlement to participate in the work release program but whether he had a protected interest in his continued participation in the program. We agree. As noted by the Supreme Court in *Greenholtz v. Nebraska Penal Inmates*, 1979, 442 U.S. 1, 9, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, "[t]here is a crucial distinction between being deprived of a liberty one has

..., and being denied a conditional liberty that one desires". The plaintiff in the instant case had already been granted the right to participate in the Alabama work release program. Further, a state-created liberty interest may originate in a state statute or in regulations or in the practices of state or county officials. *Vitek v. Jones*, 445 U.S. at 489–90, 100 S.Ct. at 1261–62; *Dudley v. Stewart*, 11 Cir.1984, 724 F.2d at 1497–98; *Parker v. Cook*, 642 F.2d at 876–77. Our inquiry, therefore, must be whether the State of Alabama, by statute, regulation, or practice, created a liberty interest in the plaintiff's continued participation in the Alabama work release program that could not properly be revoked without due process of law.

■ Resolution of this question requires a factual inquiry into the full range of state action on continued participation in the work release program. The court must examine the statute creating the program, the regulations governing work release, and the practices of the prison officials in administering the program to determine whether any of these sources place a restriction on the prison official's discretion to revoke a prisoner's work release status. *Parker v. Cook*, 642 F.2d at 876–77. Absent proof of any such restriction on the agency's discretion, the plaintiff can show no "substantive interest" to which he has a "legitimate claim of entitlement" protected by the due process of law, *Olim v. Wakinekona*, 1983, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813;

> "[Recent Supreme Court] cases demonstrate that a State creates a protected liberty interest by placing substantive

---

**10.** Although it found, in accordance with the Supreme Court's decision in *Meachum v. Fano*, that revocation of the prisoner's work release status "did not *ipso facto* constitute a deprivation of liberty requiring due process", *Durso*, 579 F.2d at 1368, the court felt "compelled to note the strong similarities between parole and work-release". *Id.* at 1371. The court noted: "Like a parolee, a convict on work-release can pursue employment or education. He is eligible for leaves to renew contact with his family. He may also be released to participate in unsupervised activities in the community". *Id.* Al-

though this conditional liberty is not enough, without more, to trigger due process protections, it may "strengthen the claim of a justifiable expectation based on penal practice and prison regulations that recommitment to prison is dependent on misbehavior or the occurrence of other specified events". *Garcia v. DeBatista*, 1 Cir.1981, 642 F.2d 11, 17. *See infra* note 14 and accompanying text.

**11.** *See supra* note 10.

limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the State's decision-makers.' *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467 [101 S.Ct. 2460, 2466], 69 L.Ed.2d 158 ... (1981) (Brennan, J., concurring). If the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' [*Meachum v. Fano*, 427 U.S. at 228, 96 S.Ct. at 2540], the state has not created a constitutionally protected liberty interest.... (citations omitted)"

*Id.*

■ Whitehorn asserts that both the regulations governing work release and the practices of prison officials in administering the program have placed substantive limitations on the officials' discretion to remove a prisoner from the work release program. In support of this assertion, Whitehorn refers first to the "Rules and Information Handbook for Community Based Residents" issued by the Alabama Department of Corrections on December 7, 1978 [Handbook].[12] The Handbook summarizes the rules governing inmate conduct in community pre-parole centers and sets out the institutional disciplinary procedures applicable upon a prisoner's commission of any of the twenty-seven major infractions listed in the Handbook. Under the heading "manipulation of money policy", the violation for which Whitehorn received a "major disciplinary", the Handbook provides only that "[v]iolator[s] will forfeit not less than four (4) months good time". The Handbook provides generally that any major infraction could result in a prisoner's removal from the work release program; the

determination of a prisoner's work release status upon a violation of the rules set forth in the Handbook rests at the discretion of the director of the community based facility. Handbook at 11.[13] Under the heading "INSTITUTIONAL DISCIPLINARY PROCEDURES", the Handbook directs that "[T]he Disciplinary Board is used to hear major violations of institutional rules and regulations" and that "[p]unishment can be imposed only after a hearing". Handbook at 20.

Whitehorn contends that these regulations substantially restrict the center director's discretion to remove a prisoner from work release, because removal is warranted only after a prisoner is served with a major disciplinary, a hearing has been held, and consideration has been given to the relative merits of continuing the prisoner in the program with additional guidance and counseling. He urges this court to find that these regulations create a legitimate expectation of continued entitlement to participation in the work release program absent proof of misconduct and an evaluation that removal from the program would be in the best interests of the prisoner and the program. He also asserts that his removal from work release for violation of the money policy is inconsistent with the established practices and policies of the prison's administrators.

The government argues that these regulations do not place substantive restrictions on the prison administration's discretion to remove a prisoner from work release but merely set forth the reasonable bounds within which the administration may exercise this discretion. The Handbook does contain an omnibus clause which provides that "Work Release is a privilege that has

---

**12.** *See supra* note 3.

**13.** Specifically, the Handbook provides:
 "Violations of major infractions could result in your removal from the Work Release program. However, because Work Release is a transitional program to prepare you for re-entry into the community, the staff may work with you in overcoming problems. If you are served with a disciplinary the determination

of your status will rest at the discretion of the Director. He will take into consideration such things as safety of the community, the program, your needs, your past record, and your probability to overcome your problem with adequate guidance and counseling...."
Rules and Information Handbook for Community Based Residents ECS, December 7, 1978, at 11.

been given you, and as such can be withdrawn at the discretion of your Center Director, pending the concurrence of the Commissioner of the Board of Corrections". Handbook at 23. The government therefore contends that a prisoner's work release status can be revoked "for any reason or for no reason at all" and does not rise to the level of a constitutionally protected liberty interest.

The rules and procedures set forth in the Handbook suggest that the Alabama Department of Correction's discretion to terminate a prisoner's work release status is a guided discretion that cannot be exercised for any reason or for no reason at all. This limitation on the prison administration's discretion, coupled with the severity of the loss of conditional liberties enjoyed by a participant in the work release program,[14] tends to establish a legitimate expectation or entitlement to the plaintiff's continued participation in the work release program. There is conflicting evidence on the record before us, however, as to what other regulations may have been in effect at the time Whitehorn's work release status was revoked.[15] Moreover, although the plaintiff has asserted that his protected liberty interest stems, at least in part, from the practices of the prison administration, there has been no factual development in the case concerning these practices. All of these elements must be considered before a determination can be made of the nature of the plaintiff's protected liberty interest, if any, its scope, and the due process protections implicated by its revocation.

Such an extensive inquiry into state law and practices is properly undertaken at the district court level:

"Even though statutes and regulations are written, an appellate court would have difficulty reviewing a district court determination of whether a liberty interest was created in the absence of a full factual development concerning the practices of the state, for the interaction between written regulations and actual practices often produces results not apparent by mere examination of the regulations. Moreover, the practices of a state may be determinative, for even if a state by statute or regulation explicitly refuses to grant inmates certain liberty interests, practices of a state may nevertheless give rise to those same liberty interests. In the event a liberty interest is determined to exist, a detailed examination of the degree of the change in conditions is necessary to determine

---

14. *See supra* note 10.

15. There is a dispute as to what regulations were in effect at the time of Whitehorn's removal from work release. In addition to the regulations and procedures contained in the Handbook, Whitehorn has called the court's attention to Administration Regulation Number 403 which sets out the "due process requirements" that must be met in disciplinary hearings. These requirements include:

"(1) Advance written notice of the charges against the inmate be given him at least 24 hours before his appearance before the disciplinary committee.
(2) That the inmate be present to present evidence, to call witnesses and to make documentary evidence available in his defense providing there is no undue hazard to institutional safety.
(3) That if the inmate wishes assistance, he may choose an on-duty staff member to assist him in his defense provided the staff member agrees and is not a witness or otherwise involved in the disciplinary action or appeals process.

(4) That although the charged inmate is not entitled to confrontation or cross-examination, he may submit, in writing, prior to the hearing, any questions relevant to the charge(s) or case.
(5) The institutional disciplinary committee be impartial.
(6) That there be a written statement by the fact finders as to the non-confidential evidence relied upon and reasons for the disciplinary action recommended."

State of Alabama Board of Corrections, Administrative Regulation Number 403(c)(5)(1), effective June 1, 1982.

Although the existence of procedural requirements does not, without more, create a liberty interest, such requirements and the practices of the department in implementing them are relevant to a determination whether a liberty interest has been created. On remand, therefore, the court must determine what regulations were in fact in effect at the time Whitehorn was removed from work release.

what minimum process the state must provide."

*Parker v. Cook,* 642 F.2d at 876. Whitehorn has alleged that the regulations and practices of the Alabama Department of Corrections have limited official discretion to revoke work release status absent a disciplinary violation or some other specified events. He has also raised a genuine issue of material fact as to the regulations applicable at the time his work release status was revoked and as to the official prison practices regarding revocation of work release. The district court should make the appropriate inquiry into the laws, regulations, and practices of the State of Alabama regarding termination of a prisoner's work-release status; resolve the factual disputes; and decide whether Whitehorn had a constitutionally protected liberty interest in his continued participation in work release. Summary dismissal of Whitehorn's claim was, therefore, inappropriate.

### IV.

 The defendants assert that we need not remand this case for consideration of state regulations and practices that may have created a protected liberty interest because the interest, even if it existed, was not revoked without due process of law. We reject this argument for two reasons. First, a determination of the process due in any situation depends upon the nature of the interest that is threatened. The requirements of due process cannot be determined in a vacuum: Due process "is flexible and calls for such procedural protections as the particular situation demands". *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600. The due process analysis requires a balancing of "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment". *Hewitt v. Helms,* 459 U.S. at 473, 103 S.Ct. at 872. This analysis cannot be undertaken until the precise nature of the protected interest is determined. Second, even were we able to determine the precise nature of the plaintiff's protected interest, if any, we cannot agree on the basis of the record before us that due process has been afforded in this case. Although Whitehorn was given a hearing, this proceeding took place eight days after he was removed from the work release program and returned to the general prison population. We cannot determine from a review of this record whether revocation of Whitehorn's work release status before a hearing was afforded him was necessitated by any institutional needs or goals. Nor can we determine whether the procedure afforded Whitehorn adequately protected his interest[16] while affording the prison administration the "wide-ranging deference in the adoption

16. Whitehorn asserts that his hearing was unfair as well as untimely. He argues that he was deprived of an unbiased tribunal because the officer who investigated his case also served on the disciplinary committee. He also asserts that he was denied the opportunity to confront witnesses against him and to review all of the inculpatory evidence considered by the disciplinary committee in making its recommendation that the plaintiff be permanently removed from work release. These allegations should be considered by the trial court on remand.

Whitehorn further asserts that an adversary hearing must be held not only to determine his guilt or innocence on the disciplinary charge but also to determine whether removal from work release is consistent with prison policy and the goals of the work release program. The Supreme Court has required such a two-stage hearing in parole and probation revocation hearings. *See Morrissey v. Brewer,* 408 U.S. at 471, 92 S.Ct. at 2593. The initial inquiry involves a preliminary factual determination whether a violation has occurred. This stage requires an informal adversary hearing, after the prisoner has been given notice of the charges against him, at which the prisoner may confront witnesses, introduce evidence, and speak in his own behalf. *Id.* The second stage of the inquiry, if a violation is found to have occurred, involves a determination whether revocation of work release is the proper sanction. This inquiry is more subjective and requires the exercise of the prison officials practiced judgment and discretion. Therefore, procedures "designed to elicit specific facts ... are not necessarily appropriate in this context". *Greenholtz,* 442 U.S. at 13–14, 99 S.Ct. at 2106–2107. A full adversary hearing on the sanctions imposed if the plaintiff is found to have violated the rules applicable to work release is not, therefore, required by the due process clause.

and execution of policies and practices ... [required to] preserve internal order and discipline and to maintain institutional security". *Id.* at 688–89. We therefore remand the case for full factual development at a trial on the merits.

### V.

On remand, the district court should consider what remedies may be appropriate if the Alabama Department of Corrections infringed upon Whitehorn's constitutional rights. If the court determines that damages should be awarded, it also may be required to determine whether the defendants enjoy official immunity from recoveries in damages. Although the defendants are not entitled to absolute immunity, *Procunier v. Navarette*, 1978, 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24, they may be entitled to a qualified "good faith" immunity. *Id. See Wood v. Strickland*, 1975, 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214. To be entitled to good faith immunity, the prison officials must meet both the objective and subjective elements of the defense:

> "[T]he immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm ... [or if the defendants have acted with] 'malicious intention' to deprive the plaintiff of a constitutional right or to cause him 'other injury'."

*Procunier*, 434 U.S. at 562 and 566, 98 S.Ct. at 859 and 862 (citing *Wood*, 420 U.S. at 322, 95 S.Ct. at 1001). On remand, therefore, if Whitehorn's constitutional rights are found to have been violated and the immunity defense is asserted, the district court will be required to determine whether the defendants deprived Whitehorn of an interest that was "clearly established at the time of their challenged conduct" and whether they acted with " 'malicious intention' to deprive the plaintiff of a constitutional right or to cause him 'other injury' ".

### VI.

Whitehorn's interest in his continued participation in the Alabama work release program is not an interest finding protection in the due process clause itself. Revocation of this interest may, however, trigger the protections of the due process clause if the State of Alabama, through its statutes, regulations, or official practices has placed substantive restrictions on the prison administration's discretion to revoke work release participation. There are material questions of fact as to the regulations in force at the time the plaintiff's work release status was revoked and as to the practices of the Department of Corrections that may have placed restrictions on the Department's discretion to revoke work release status. Summary judgment on this issue was, therefore, inappropriate. For these reasons, we REVERSE the judgment of the district court and REMAND for trial.