Suzanne Ruth EDWARDS, Appellee,

v.

**A.L. LOCKHART,**
**Superintendent, Appellant.**

**Nos. 89–2085, 89–2432.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1990.

Decided July 10, 1990.

C. Kent Jolliff, Little Rock, Ark., for appellant.

Timothy Dudley, Little Rock, Ark., for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and BRIGHT, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

A. L. Lockhart, Director of the Arkansas Department of Correction, appeals the magistrate's[1] order, which requires the State to reinstate Suzanne Ruth Edwards in its Act 814 work/study release program and mandates that a writ of habeas corpus be issued if the State fails to act accordingly. Lockhart also appeals the magistrate's order designating a specific hearing officer if the State chooses later to remove Edwards from the 814 program using the State's parole revocation procedures. We affirm the magistrate's order reinstating Edwards to the 814 program.

Edwards was convicted of eight counts of forgery in the Circuit Court of Pulaski County, Arkansas and was subsequently sentenced to ten years imprisonment in the Arkansas Department of Correction (ADC). Edwards was released from confinement by the ADC on March 29, 1988, under the provisions of the 814 program. The ADC was authorized to create the 814 program and its governing regulations under Ark. Stat.Ann. § 46–117 (1977 Repl.), recodified at Ark.Code Ann. §§ 12–30–401–08 (1987), and Act 814 of 1983. Regulation AR–1211 was enacted to govern the program. The regulation contains the program's policy,

---

1. The Honorable John F. Forster, Jr., United States Magistrate for the Eastern District of Ar-  kansas.

which is "[t]o allow the ordered reintegration of selected inmates from a prison environment back into communities through participation in a Work/Study Release Program *outside* the Department of Correction facilities." (emphasis added). The regulation excludes certain inmates from participating in the program, sets out the program's application process, and establishes other rules governing the program. Under the 814 program, a prisoner is released from confinement and allowed to live and pursue studies or work outside corrections facilities under the close supervision of a parole officer.

On June 6, 1988, Edwards' parole officer, Mark Gibson, was informed that Edwards was using illegal narcotics, which is a violation of the 814 program. Pursuant to Gibson's request, Edwards produced a urine sample for testing. On June 10, Gibson contacted Edwards' employer and ascertained that Edwards was not currently working, which is a requirement of the 814 program, and had not worked since April 27, despite the fact that she had been reporting each week that she was employed.[2] Later that day, Gibson went to question Edwards at her parents' home where she was staying. Edwards told Gibson that she had been laid off for two weeks and that she was scheduled to be called back to work the next day. During his conversation with Edwards, Gibson saw what appeared to be needle marks on both of her arms. Gibson then decided to search Edwards' room. During the search, Gibson found drug paraphernalia, including two syringes, one with and one without a needle, and an unidentified white powder.[3] Edwards was then arrested, questioned, and taken back into custody by the ADC and placed in a punitive isolation section.

Edwards was charged with possessing drugs, failing to maintain employment, and falsifying report forms. Edwards was informed of the charges verbally before being returned to the ADC and in writing

fifteen days prior to her hearing. Eighteen days after she was returned to the ADC, Edwards had a hearing before an ADC officer sitting as a disciplinary court. The disciplinary court found her guilty of possessing drug paraphernalia, failing to obey orders, and falsifying reports concerning her work assignment. As a result of these violations, Edwards' inmate classification was reduced from IA to IV and she was sentenced to thirty days punitive time with fifteen days credited for time served. The change in Edwards' classification made her ineligible for the 814 program. The disciplinary court's findings were affirmed through disciplinary appeal on July 11, 1988.

Edwards then filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (1982). In deciding to order Edwards' return to the 814 program, the magistrate reasoned that Edwards had been granted conditional liberty under the 814 program and that she was entitled to due process protection prior to its revocation, citing *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The magistrate also concluded that Edwards had not been given due process by the ADC, again citing *Morrissey*. The magistrate ordered that Edwards should be returned to the 814 program and, if she was not, that the writ of habeas corpus should be issued. In a later order, issued in response to motions to clarify filed by both Edwards and Lockhart, the magistrate held that any hearing concerning the removal of Edwards from the 814 program could only be conducted by Jackson Jones, Parole Hearing Examiner for the State Parole Board and the ADC. Lockhart appeals from both orders.

## I.

We first turn to the issue of whether Edwards has a liberty interest in remaining in the 814 program which would entitle her to due process protection. Lockhart

---

**2.** In forms submitted to Gibson, Edwards stated that she had worked four days a week between April 27 and May 24, three days a week between May 25 and May 31, and two a days a week between June 1 and June 6.

**3.** Tests on Edwards' urine sample and the white powder were both negative.

argues that Edwards, as a work release inmate, has not been vested with such an interest. Edwards maintains that her status under the 814 program is akin to that of a parolee or probationer.

"Liberty interests protected by the Fourteenth Amendment may ⋅arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). The Supreme Court has found liberty interests arising from the due process clause for petitioners resisting the revocation of parole, *see Morrissey*, 408 U.S. 471, 92 S.Ct. 2593, and for petitioners resisting the revocation of probation, *see Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). "A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional freedom such that 'the loss of liberty entailed [by its revocation] is a serious deprivation requiring that the [prisoner] be accorded due process'." *Whitehorn v. Harrelson*, 758 F.2d 1416, 1420 (11th Cir.1985) (footnote omitted) (quoting *Gagnon*, 411 U.S. at 781, 93 S.Ct. at 1759).

Participants in the 814 program must: (1) have a sponsor; (2) maintain a job; (3) not work for relatives or be self-employed; (4) not consume alcoholic beverages; (5) obey all ADC rules and regulations; (6) receive prior approval before making any changes in their work release agreement, such as changing their residence, changing their place of employment, leaving the county in which they reside or the State, or getting married. Participants in the 814 program live outside the facilities of the ADC, as in this case where Edwards was living with her parents.

Lockhart argues that the distinction between parolees and 814 program participants is the degree of supervision under which an 814 program participant functions. He maintains that 814 program participants are subject to closer supervision by their parole officers, and are required in some instances to obtain approval of not only their parole officers, but also other officials to change their conditions of re-

lease. Lockhart maintains that these additional constraints show that the 814 program participants have not been totally released from institutional life, as in the case of parolees, but have simply had the conditions of their confinement changed, and therefore, that they do not have. a liberty interest in remaining in the program.

Lockhart particularly relies on *Brennan v. Cunningham*, 813 F.2d 1 (1st Cir.1987), involving an inmate's release to a halfway house. The court there held that while the prisoner enjoyed significant liberty, "he remains under confinement in a correctional institution," *id.* at 5, and his position was, therefore, not like that of a parolee. The court in *Brennan* did not find a liberty interest for the inmate under the fourteenth amendment, although it did hold that the rules pertaining to the inmate did provide him with "a due process liberty interest in remaining at the ... halfway house." *Id.* at 8. Lockhart also cites *Whitehorn*, 758 F.2d 1416, to support his position. In *Whitehorn* an inmate was placed in a work release program and assigned to the Montgomery Work Release Center. The court noted that an inmate who is placed in a work release program enjoys rights somewhere in between the rights enjoyed by a parolee or probationer and those enjoyed by an inmate in the general prison population, and concluded that the inmate did not possess a liberty interest in remaining in the work release program. *Id.* at 1421. This holding was premised on the court's consideration of Supreme Court cases, its own conclusion that the inmate had not been "released from institutional life altogether," *id.*, and the fact that the inmate's "return to the general prison population did not subject him to confinement beyond the sentence initially imposed upon him," *id.* Lockhart also cites an earlier decision of this court, *Hake v. Gunter*, 824 F.2d 610 (8th Cir. 1987). *Hake* involved the transfer of an inmate from the general prison population to the Air Park Annex to the Lincoln Community Correctional Center, where he participated in a work detail program. *Id.* at 612. The inmate did not argue that his

liberty interest in remaining in the program was based on the due process clause itself; rather, he maintained that this interest was derived from rules and regulations concerning an inmate's removal from work detail. *Id.* at 615. We remanded *Hake* for further proceedings to determine if those rules and regulations created a constitutionally-protected liberty interest. *Id.* at 615–17.

The programs in *Brennan, Whitehorn,* and *Hake* differ substantially from that in this case. In each, the inmate was transferred from a more restrictive to a far less restrictive environment, but, nevertheless, remained a resident in a facility operated by their respective corrections departments. In contrast, Edwards, under the 814 program, had been released for participation in a program outside the ADC's facilities, and, in fact, had been released from institutional life altogether.

Parole programs release inmates from incarceration to the community and require participants to be subject to a number of specified conditions while on parole.

These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. Typically, *parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons. Typically, also they must seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness. Additionally, parolees must regularly report to the parole officer to whom they are assigned and sometimes they must make periodic written reports of their activities.*

*Morrissey,* 408 U.S. at 478, 92 S.Ct. at 2598 (emphasis added).

We recognize that the 814 program has some differences from a parole program; both, however, do involve release of inmates from incarceration. Certainly the 814 program involves a greater degree of supervision than parole, requiring its participants to meet more often with their parole officers and to maintain gainful employment or to pursue a study program, as well as mandating other significant reporting and supervision requirements imposed by the State. Regardless, under the 814 program, Edwards lived completely outside an institutional setting.

We also recognize that simply applying the label "work release" to a program does little to advance analysis of it. Frequently, as in the federal system, work release programs entail the initial transfer of an inmate to a separate facility, the daily release of the inmate from that facility into the community, and the return of the inmate each evening to the facility.[4] Several states, including those under consideration in the *Brennan, Whitehorn,* and *Hake* decisions above have adopted somewhat similar programs. Other programs, such as the one before us today, however, allow the inmate to be released from incarceration and live outside institutional facilities. We must look specifically to the inmate's own program to determine what liberty interests are affected.

Viewing parole and work release on a continuum, *see Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987), with more freedom and self-determination associated with parole and less with work release, we believe that Edwards' participation in this program is more closely related to parole. Certainly Edwards is subject to more constraints in the 814 program than she would be if on parole, but we find determinative the fact that she has been released from institutional life into society. The constraints applied to Edwards serve to guide her in the out-

---

**4.** Under such work release programs, "an inmate is released from incarceration each day and introduced back into society to participate in paid employment in the community. Each evening the inmate must return to confinement." Note, *The Federal Prisoner's Right to a Due Process Hearing Before Work–Release Revocation,* 15 U.S.F.L.Rev. 617, 617 n. 1 (1981). *See* S.Rep. No. 613, 89th Cong., 1st Sess. 5, *reprinted in* 1965 U.S.Code Cong. & Admin. News 3076, 3079 (discussing the federal work release program).

side world, not, as Lockhart argues, to confine her to the equivalent of an institutional life.

Our conclusion that Edwards' status in the 814 program is similar to that of parole is supported not only by comparing the 814 program with the Supreme Court's definition of parole in *Morrissey*, but also by other evidence presented at Edwards' hearing. At that hearing, Mike Gaines, Chairman of the State Parole Board and former Parole Hearing Examiner for the State Parole Board and the ADC, testified that all release programs, including regular parole and the 814 program, are generally the same. (Tr.14). He stated that "[t]here are some differences, but basically they're all supervised by a parole officer and have a set of conditions that relate to employment, residence, behavior and that type of thing." (Tr.14). Also testifying at Edwards' hearing was Jackson Jones, Parole Hearing Examiner for the State Parole Board and the ADC, who stated that:

It's my feeling that while *Act 814 inmates can be considered analogous to work release inmates, and they can be considered analogous to parolees, on balance it's been my feeling that they are more like parolees in the fact that they have been granted conditional liberty.* They are able to live at home, whereas institutional work release inmates, of course, have to go back to the institution each night.

... [S]ince they [814 program participants] are analogous to parolees ... we should probably treat them the same, I think as a matter of law and as a matter of fairness.

(Tr.65) (emphasis added).

In this case, the significant difference between the 814 program and the other work release programs we have discussed is that Edwards, even with the restrictions of the 814 program placed upon her, is, nevertheless, allowed to live in the world outside prison walls and is not confined in an institutional setting.

Therefore, in light of *Morrissey* and the evidence presented at Edwards' hearing, we conclude that the due process clause vests Edwards with a liberty interest in remaining in the 814 program and accordingly that she is entitled to due process protection for that interest.[5]

■ Lockhart argues alternatively that Edwards' disciplinary hearing gave her sufficient due process protection. The Court in *Morrissey*, discussing what process was due the holder of a liberty interest before it could be revoked, stated that:

Our task is limited to deciding the minimum requirements of due process. They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

408 U.S. at 488–89, 92 S.Ct. at 2604.

In Edwards' case, she was informed in writing of the charges against her fifteen days prior to her hearing, but none of the other minimum requirements for due process were met. In order to satisfy these minimum requirements and Edwards' right to due process protection, we hold that in any further revocation proceedings initiated against Edwards must be conducted in the same manner as regular Arkansas parole revocation hearings.

## II.

Lockhart also argues that the magistrate erred by requiring the State to utilize a specific hearing officer to determine wheth-

---

5. Accordingly, we need not consider Edwards' argument that she has a protectible liberty inter- est based upon State custom or practice.

er Edwards participation in the 814 program should be revoked. In light of the magistrate's order in *Ashworth v. Lockhart,* No. PB–C–89–322, slip op. at 3 (D.Ark. Aug. 3, 1989), allowing the State to designate any hearing officer it desires so long as he or she is independent and uninvolved as required by *Morrissey,* 408 U.S. at 485–86, 92 S.Ct. at 2602–03, which we believe to be a reasonable requirement, and his subsequent order in this case, *Edwards v. Lockhart,* No. PB–C–88–555, slip op. at 2 (D.Ark. Sept. 1, 1989), we believe that this point is moot.

## III.

Accordingly, we affirm the magistrate's order reinstating Edwards to the 814 program.