Ernest Eugene HARPER,
Petitioner–Appellant,

v.

Leroy L. YOUNG; Attorney General of
Oklahoma, Respondents–Appellees.

No. 95–5026.

United States Court of Appeals,
Tenth Circuit.

Aug. 30, 1995.

Ernest Eugene Harper, Boley, OK, pro se.

W.A. Drew Edmondson, Atty. Gen., and Jennifer B. Miller, Asst. Atty. Gen., Oklahoma City, OK, for respondents-appellees.

Before SEYMOUR, Chief Judge, McKAY and HENRY, Circuit Judges.

McKAY, Circuit Judge.

Mr. Ernest Harper, presently an inmate in the Oklahoma prison system, challenges the constitutionality of the process by which he was terminated from the Oklahoma Pre-parole Conditional Supervision Program ("the Program")—a penal status similar to, although more restrictive than, parole that allows convicts to live and work in society. The parties do not dispute that Mr. Harper received verbal notice of his renewed incarceration somewhat less than five hours before he was to turn himself in to authorities and that he was never granted any sort of hearing at which he could present evidence of any kind. Believing himself to have been deprived of liberty without due process of law, Mr. Harper first exhausted his state remedies, *see Harper v. Young,* 852 P.2d 164 (Okla.Crim.App.1993), and then petitioned the district court for a writ of habeas corpus. The district court denied this petition, and Mr. Harper now appeals.

It is well-settled that the Due Process Clause shields from arbitrary or capricious deprivation those facets of a convicted criminal's existence that qualify as "liberty interests." *See Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Certain liberty interests—of which parole and probation are of greatest salience here—inhere in the Due Process Clause and are not subject to deprivation without adherence to the strict procedural safeguards of *Morrissey.* See, *e.g., Morrissey,* 408 U.S. 471, 92 S.Ct. 2593; *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). More commonly, the liberty interests possessed by those living in prison are created, if at all, by state law. *See Sandin v. Conner,* —— U.S. ——, —— –——, 115 S.Ct. 2293, 2296–99, 132 L.Ed.2d 418 (1995) (recounting development of caselaw). In *Sandin,* the Supreme Court markedly narrowed the ranges of circumstances that will give rise to state-created liberty interest. *See id.* at ——, 115 S.Ct. at 2299–2300 (holding that state-created liberty interests "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").[1] The Oklahoma Court of Criminal Appeals has, apparently, held under pre-*Sandin* standards that the state had created a liberty interest in program participation. *See Barnett v. Moon,* 852 P.2d 161, 162–63 (Okla. Crim.App.1993).[2] The extent to which that

---

1. *Sandin* does not purport to alter the law as it pertains to those liberty interests that inhere in the Due Process Clause itself. *See Sandin,* —— U.S. at ——, 115 S.Ct. at 2299–2300; *see also id.* at —— –— ——, 115 S.Ct. at 2299–302 (opining

that prior standards had led courts to interfere in day-to-day management of incarcerated prisoners).

2. The Oklahoma Court of Criminal Appeals did not explicitly hold in *Barnett* that a state-created liberty interest existed. That court, however, did indicate that removal from the Program for disciplinary reasons should be subject to the procedural protections outlined in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935

conclusion survives *Sandin* is a question of no small difficulty.[3] We need not address it today, however, because we hold that program participation is sufficiently similar to parole or probation to merit protection by the Due Process Clause itself.

Established by statute, *see* Okla.Stat.Ann. tit. 57, § 365 (West 1995), the Program releases qualified inmates into society on a conditional basis. Program participants are chosen by the Pardon and Parole Board. Statutory criteria limit selection to those inmates who are eligible for parole, have served fifteen percent of the relevant sentence, and are within one year of a parole docket date. *Id.* § 365(A).[4] Although remaining in the "constructive custody" of the Department of Corrections, those in the Program work and reside beyond the confines of a state penal institution and are thus free to enjoy most of the benefits of a normal existence. In return, a program participant must agree to abide by restrictions similar to those placed upon a parolee.[5] Violation of a condition may result in termination from the Program and a return to incarceration. An otherwise eligible participant who has been denied parole may also be removed from the Program after a ninety-day review period. Okla.Pardon & Parole Bd.Proc. 4–11 (effective Aug. 8, 1991).[6]

█ The State does not here contend either that Mr. Harper was terminated from the Program because of ineligibility or that it possessed peremptory authority to remove him from the Program. The record, in any event, would support neither contention. Although Mr. Harper was in fact removed from the Program because he was denied parole, nothing in the regulations governing the Program mandated that result. The statute, in relevant part, requires only that an applicant be within one year of parole consideration—a condition that Mr. Harper has met at all times since his termination. Procedure 4–11, moreover, states that convicts can remain in the Program after the denial of parole. The regulations likewise contain no language suggesting that participants may be terminated "at will" upon the denial of parole. Procedure 4–11 indicates the truth of the converse: convicts have both the right to remain with the Program for ninety days after parole denial and the opportunity to be considered for continued placement with the Program. Having determined that Mr. Harper was in fact qualified to remain with the Program, we turn to the question of what procedures should have accompanied his termination from the Program.

The State contends that, similarities to parole notwithstanding, placement in the Program does not effect release from the custody of the Department of Corrections and is, therefore, merely a change in the degree or situs of an inmate's confinement. As such, the State concludes, program participation cannot be equated to parole or probation, and revocation of such participation does not warrant the extensive procedural

---

(1974)—a result which rather strongly suggests that the Oklahoma court found a state-created liberty interest in continued participation in the Program.

3. A state could, presumably, choose to impose procedural standards upon itself that are more stringent than those mandated by the Constitution. It was, of course, unnecessary for the Oklahoma Court of Criminal Appeals to draw such a distinction in *Barnett*.

4. Additional requirements have been set by Department of Corrections regulation. To qualify for consideration, an inmate must have a verified home offer; must pursue an educational program or otherwise be employed; must have no serious prison misconduct; must be medically cleared; and must have no detainers for prosecution. The state does not contend that Mr. Harper failed to meet any of these conditions.

5. He or she may be searched or visited at any time by a law enforcement officer; must report to an assigned probation officer at frequent intervals; cannot travel freely and may be subject to a curfew; cannot use drugs or alcohol or visit locations where those substances are likely to be present; may be urine tested at any time; must remain employed or pursue a full-time educational program; must pay monthly fees to the Department of Corrections; and may not assume debt or apply for public assistance without permission. The state admits that Mr. Harper violated none of these prohibitions.

6. We note that Procedure 4–11 became effective some five months after Mr. Harper was returned to prison.

protections mandated by *Morrissey*. The Oklahoma Court of Criminal Appeals, adopting the reasoning advocated by the State, has held that participation in the Program is not a liberty interest inherent in the Due Process Clause itself. *See Barnett v. Moon*, 852 P.2d 161, 162–63 (Okla.Crim.App.1993).

■ The identification of the liberty interests that are protected by the Due Process Clause is a question of federal constitutional law that we review *de novo*. *See Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). Thus, while we respect the Court of Criminal Appeals's analysis of the constitutional implications of the Program, we are not bound by it. We are instead persuaded by the contrary holding of *Edwards v. Lockhart*, 908 F.2d 299 (8th Cir.1990). In *Edwards*, the Eighth Circuit analyzed a program that "released [a prisoner] from confinement and allowed [her or him] to live and pursue studies or work outside corrections facilities under the close supervision of a parole officer." *Id.* at 300. The program considered in *Edwards*, like that at issue here, required participants to have a home sponsor, maintain employment or pursue an education, refrain from drugs and alcohol, obtain approval before leaving their county of residence, and obey all applicable Department of Corrections regulations. *Id.* at 301. Although recognizing that a participant's existence was somewhat less free than that of a parolee, the *Edwards* court nonetheless held that the similarities were sufficiently strong to warrant the process required by *Morrissey*:

> Viewing parole and work release on a continuum, with more freedom and self-determination associated with parole and less with work release, we believe that Edwards' participation in this program is more closely related to parole. Certainly Edwards is subject to more constraints in the [ ] program than she would be if on parole, but we find determinative the fact that she has been released from institutional life into society. The constraints applied to Edwards serve to guide her in the outside world, not . . . to confine her to the equivalent of an institutional life.

*Id.* at 302–03 (citations omitted).

■ "A liberty interest inherent in the Constitution arises when a prisoner has ac-

quired a substantial, although conditional, freedom such that 'the loss of liberty entailed [by its revocation] is a serious deprivation requiring that the [prisoner] be accorded due process.'" *Whitehorn v. Harrelson*, 758 F.2d 1416, 1420 (11th Cir.1985) (*quoting Gagnon*, 411 U.S. at 781, 93 S.Ct. at 1759). *Edwards*, we think, correctly identifies the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest: it is the fact of release from incarceration. The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate. It is the freedom to "be gainfully employed," "to be with family and friends," and "to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482, 92 S.Ct. at 2601. It is the ability to reside in a home of one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens. The passage outside the walls of a prison does not simply alter the degree of confinement; rather, it works a fundamental change in the *kind* of confinement, a transformation that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections outlined in *Morrissey*. *See, e.g., id.* at 481–84, 92 S.Ct. at 2600–02; *see also Brennan v. Cunningham*, 813 F.2d 1, 5–6 (1st Cir.1987) ("[T]he Court has found independent constitutional liberty interests where *total release* from institutional life has been revoked."); *Whitehorn*, 758 F.2d at 1420–21 (same); *cf. Hewitt v. Helms*, 459 U.S. 460, 467–68, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983) (analyzing transfer of inmates into administrative segregations and emphasizing difficulties of *prison* management and limited rights of *incarcerated* convicts); *Wolff*, 418 U.S. at 561–63, 94 S.Ct. at 2977–78 (recognizing difficulties of implementing *Morrissey* procedures in *prison* environment).

■ We are therefore in accord with the Eighth Circuit in concluding that a prisoner release program which permits a convict to exist, albeit conditionally, in society on a full-time basis more closely resembles parole or probation than even the more permissive

forms of institutional confinement. *See Edwards,* 908 F.2d at 302–03; *see also United States v. Stephenson,* 928 F.2d 728, 732 (6th Cir.1991) (finding inherent liberty interest in continued placement in supervised release program that allowed convicts to live in society); *cf. Brennan,* 813 F.2d at 5–6 (finding no inherent liberty interest in continued placement with institutional halfway house); *Whitehorn,* 758 F.2d at 1420–21 (finding no inherent liberty interest in continued participation in work release program that confined convicts to institutional community center). There is no question but that those in the Program enjoy the benefits and joys of gainful employment, the company of family and friends, and the pursuits of humdrum existence. Finding no material distinction between the program addressed in *Edwards* and that presented here, we adopt the sound reasoning of our fellow circuit. Due process therefore mandates that program participants receive at least the procedural protections described in *Morrissey:*

> (a) written notice of the claimed violations ...; (b) disclosure ... of [the] evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers of lawyers; (f) a written statement by the factfinders as to the evidence relied on and the reasons for [revocation].

*Morrissey,* 408 U.S. at 489, 92 S.Ct. at 2604.

█ The record conclusively demonstrates that the process afforded Mr. Harper fell far short of the *Morrissey* standard. On March 14, 1991, at 5:30 a.m., Mr. Harper received a telephone call from his parole officer informing him that he had been removed from the Program because he had failed to win parole.

Mr. Harper was given until 10:00 a.m. to report to the Program office and was returned to prison later that same day. He subsequently was mailed a four-word explanation of the reasons for his removal from the Program. He received no subsequent hearing or other opportunity to respond to the Parole Board's decision to remove him from the Program. Mr. Harper therefore received no prior written notice of revocation; no opportunity to offer evidence, rebut arguments made against him, or argue on his own behalf; and no meaningful explanation of the reasons for his termination from the program. In sum, the record supports the conclusion that Mr. Harper received almost no process at all before he was deprived of his liberty.[7]

We therefore reverse the decision of the district court and remand with instructions to issue the writ of habeas corpus unless Mr. Harper is reinstated to the Program by the State of Oklahoma. After reinstatement, any attempt to remove Mr. Harper from the Program must, of course, comply with the procedures mandated by this opinion.

REVERSED and REMANDED.

---

7. The Oklahoma Court of Criminal Appeals also concluded that Program Procedure 4–11 gives inmates adequate prior notice that they can be returned to prison if parole is not granted. *See Harper,* 852 P.2d at 165. However, we note that Procedure 4–11 was promulgated on August 8, 1991, some five months after Mr. Harper's termination from the program. In addition, Mr. Harper received none of the other procedural safeguards required by *Morrissey* and was not even afforded the less comprehensive process deemed necessary by the Court of Criminal Appeals in the companion case of *Barnett v. Moon, see Barnett,* 852 P.2d at 163.