Randall L. WELLER, Plaintiff,

v.

GRANT COUNTY SHERIFF, John Lawson, in his official capacity; Grant County Community Corrections, and Reggie Nevil, in his individual capacity.

No. 1:98–CV–360.

United States District Court, N.D. Indiana, Fort Wayne Division.

Nov. 22, 1999.

Christopher C Myers, Myers and Geisleman, Fort Wayne, IN, for Randall L Weller, plaintiff.

Robert T Keen, Jr, Monica S Weaver, Miller Carson Boxberger and Murphy, Fort Wayne, IN, for John Lawson, Grant County Community Corrections, Reggie Nevil, defendants.

C Erik Chickedantz, Hawk Haynie Gallmeyer and Chickedantz, Fort Wayne, IN, for C Erik Chickedantz, mediator.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on a Motion for Summary Judgment filed by the defendants on September 9, 1999. Plaintiff responded to that motion on October 12, 1999 to which defendants replied on November 1, 1999. For the following reasons, the motion for summary judgment will be granted.

### Discussion

This section 1983 action was filed as a result of plaintiff Randall Weller's stay at the Grant County Jail from December 9, 1996 through September 3, 1997. As a result of plaintiff's removal from work release, he contends that his rights to due process were violated. The facts underlying the claim are relatively undisputed and are as follows.

On November 18, 1996 an Order was issued by Grant Superior Court Judge Thompson sentencing plaintiff to a term of three years with the Indiana Department of Corrections as a result of plaintiff's conviction for criminal recklessness, a class D felony. Half of the time was suspended (for which plaintiff would be on probation) with plaintiff allowed to serve the remaining year and one-half in the Grant County Jail. The Sentencing Order further provided that plaintiff was eligible for the work release program, subject to the approval of the Grant County Sheriff.

The Grant County Sheriff, defendant John Lawson, gave the authority to run the work release program to defendant Reggie Nevels. Plaintiff was admitted to the work release program.

As part of his assignment to the work release program, plaintiff signed a contract dated November 25, 1995 wherein he agreed to abide by all the rules and regulations of the Grant County Sheriff's Department. The contract provided that any violation of a law or the terms of the agreement could lead to the termination of work release privileges. The agreement also indicated that removal from the program as a result of the violation of its terms was not subject to appeal.

On December 9, 1999, plaintiff began participating in the work release program. He worked at the Chrysler Transmission Plant in Kokomo, Indiana, a job he had held prior to his incarceration, and returned to the jail at the end of his shift.[1]

Three infractions of the work release rules led to plaintiff's termination from the program and his subsequent firing by Chrysler in March 1997 for failing to return to work. The first such infraction occurred on January 4, 1997 when he received a speeding ticket for traveling 77 miles per hours in a 55 mile per hour zone. He was removed from the work release program for two or three days (beginning about January 6, 1997)[2] and given a specific route to travel to and from work.

---

1. Plaintiff began working at the plant in April 1994. During the relevant period he worked as a "job setter" on the second shift earning $18.50 per hour.

2. In their respective briefs, defendants claim the suspension was for two days while the plaintiff claims that it was for three days. This discrepancy of a day is of no moment.

The second incident occurred on March 9, 1997. Defendants claim that plaintiff refused to clean the dayroom and lied to a jail officer. Plaintiff insists that he was threatened by another inmate over a television program and that sometime during the complaint and investigation stage of this incident it was asserted plaintiff called a deputy a liar. In any event, he was suspended from the work release program and not allowed to go to work on that day.

The third incident occurred on March 20, 1997 when plaintiff was observed by an off-duty jail officer driving outside of his normal route from work to the jail. Plaintiff later admitted during an interview with Deputy Carmichael that he stopped by his mother's house[3] to express his condolences to his grandmother and family for the recent passing of one of his great-aunts.

After the third incident, plaintiff had a brief meeting with corporal Carmichael and a few days later with Sergeant Nevels, his mother and grandmother. It was determined that plaintiff would be removed from the work release program. He was not given any sort of hearing (no attorney was present, evidence was not introduced, and he was not allowed to cross-examine witnesses) and he asserts that he was not officially informed that he was removed from the program or the reason(s) for the removal. It is undisputed, however, that he did in fact violate the terms of his work release contract as a result of the aforementioned incidents.

The parties disagree to some extent about the conditions of confinement plaintiff faced while in work release as compared to those he faced when he was removed from the program.[4] The record does suggest at least some differences which are worthy of note.

While plaintiff was in the work release program, he was housed on the fifth floor of the jail (that is, of course, when he was not at or traveling to or from work). This was a dormitory type area where inmates could wear street clothes, interact with one another, and where inmates had ready access to the showers, telephones and a television. Those inmates slept on beds with a spring and had sheets, blankets and a pillow. The inmates had their own towels and washcloths.

Upon his removal from the work release program, plaintiff was placed in solitary confinement for a period of five days. In solitary confinement, the cells are 6' × 10' and contain a lavatory and bench mounted to the floor. Plaintiff slept on a plastic mat on the floor and had a blanket but no pillow or sheets. His access to the shower was limited—he only was taken to the shower twice during his confinement and even then was given neither soap or shampoo. Solitary confinement, as the term implies, meant that plaintiff had no access to others. He also did not have access to a television or telephone, did not have access to books, and was allowed no visitors.[5]

After his stint in solitary confinement, plaintiff was transferred to the third floor. This was the general population area which housed other felony inmates. While in the general population, plaintiff was placed in a three-man cell and slept on a plastic mat on the floor with a blanket but no pillow or sheets. He could shower anytime between 6:00 a.m. and 10:00 p.m., could use the telephone during that period and was allowed one visitor per week. Unlike his stay on the fifth floor, plaintiff was placed in a lockdown status between the hours of 10:00 p.m. to 6:00 a.m.

Plaintiff claims that as a result of being removed from his participation in the work

---

3. That house apparently was located a couple of blocks from his designated work to jail route.

4. Given that defendants are moving for summary judgment, plaintiff's version of the facts are credited for present purposes.

5. He also was not allowed to paint, a hobby he had taken up while housed on the fifth floor.

release program, he lost his job at Chrysler. His financial difficulties spiraled—plaintiff lost his house and truck and was unable to make child support payments. Additionally, plaintiff claims that his self-worth declined and he began (or resumed) abusing alcohol.

Plaintiff filed this action alleging a deprivation of his liberty and contending that prior to his having been removed from the work release program he was entitled to a hearing which comported with due process. As indicated at the outset, defendants have moved for summary judgment and this Court need not rehash the well-worn standard regarding summary judgment. Cognizant of those standards and recognizing that judgment is proper under Rule 56(c) of the Federal Rules of Civil Procedure only when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" this Court is firmly of the view that summary judgment is mandated in this case.

■ Preliminarily, this Court must address the legal question of whether plaintiff's present action is prohibited by the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 113 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and its progeny *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). Contrary to defendants' opinion, this Court does not view those cases as a bar to plaintiff's claim.

In *Heck,* the United States Supreme Court wrote:

[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence, if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the actions should be allowed to proceed, in the absence of some other bar to suit.

*Id.* at 487, 114 S.Ct. at 2372.[6]

Subsequently, in *Edwards,* the Supreme Court extended *Heck* to an inmate's section 1983 challenge to a prison disciplinary proceeding which resulted in the loss of good time credits thereby affecting the duration of plaintiff's confinement. Since in that case the inmate alleged deceit and bias on the part of the hearing officer who imposed the sanction of loss of good time credits, this necessarily implied "the invalidity of the punishment imposed" and accordingly the section 1983 claim for damages was not cognizable. 117 S.Ct. at 1587 & 1589.

In arguing that *Heck* and *Edwards* bar the present claim, defendants in their brief point to two cases, *Garcia v. Payne,* 1998 WL 50207 (S.D.N.Y.1998) and *Roucchio v. Coughlin,* 29 F.Supp.2d 72 (E.D.N.Y.1998)

---

**6.** In essence, "*Heck* holds that a damage claim that 'necessarily demonstrates the invalidity of [a] conviction,' 512 U.S. at 481–82, 114 S.Ct. at 2369, may not be brought while the conviction stands. If the conviction should be reversed or otherwise set aside, however, then damages become potentially available." *Gonzalez v. Entress,* 133 F.3d 551, 553–554 (7th Cir.1998); *accord, McCurdy v. Sheriff of Madison County,* 128 F.3d 1144 (7th Cir.1997).

both out of district courts in New York where the courts ruled that a plaintiff could not bring a section 1983 action challenging procedural defects in the process utilized to remove him or her from a temporary work release program without first pursuing state remedies. The continued validity of those decisions are in grave doubt since the United States Court of Appeals for the Second Circuit has "recently ruled that *Heck* and *Balisok* [*Edwards*] do not bar a section 1983 suit complaining of conditions of confinement where the prisoner is not challenging the overall length of confinement." *Kim v. Hurston*, 182 F.3d 113, 118 fn. 3 (2d Cir. 1999) (citing, *Jenkins v. Haubert*, 179 F.3d 19, 27 (2d Cir.1999)). Indeed, in *Kim*, the Second Circuit was presented with a claim under section 1983 brought by an inmate who claimed that her removal from work release violated her due process rights and the Second Circuit found that neither *Heck* nor *Edwards* barred the litigation.

Closer to home, the law in the Seventh Circuit may be viewed as being more opaque.[7] On numerous occasions, *see, e.g.,* *Lusz v. Scott*, 126 F.3d 1018 (7th Cir.1997); *Stone–Bey v. Barnes*, 120 F.3d 718 (7th Cir.1997); *Dixon v. Chrans*, 101 F.3d 1228 (7th Cir.1996); *Evans v. McBride*, 94 F.3d 1062 (7th Cir.1996), cert. denied, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997) and *Miller v. Indiana Dep't of Corrections*, the Seventh Circuit predicted and then followed what *Edwards* would make the law of the land and that is that *Heck* applies to "judgments" rendered in prison disciplinary settings. Tellingly, all save *Stone–Bey*, involved disciplinary proceeding which resulted in good-time credits being revoked which thereby extended the prisoner's duration of confinement and as such the *Heck* requirements would appear to be wholly applicable since the "judg-

ment" affected the duration of plaintiff's confinement.[8]

True, *Stone–Bey* stands apart from those decisions because in that case the Seventh Circuit answered the question "[d]oes it make any difference in applying *Heck* that the sentence imposed was one of disciplinary segregation alone, as opposed to segregation coupled with a loss of good-time credits?" in the negative. However, that case may be an anomaly since although apparently not dispositive to the Seventh Circuit in any way (given the framing of the foregoing question), Stone-bey faced more than just a change in the conditions of his confinement, because, although a lifer, his receipt of disciplinary action made him ineligible for a clemency hearing to which he had otherwise become entitled. As has been noted, "the [Supreme] Court has never announced that the *Heck* rule bars a prisoner's challenge under § 1983 to an administrative or disciplinary sanction that does not affect the overall length of his confinement" and in fact *Edwards* "focused exclusively on the revocation of [the inmate's] good time credits which, of course, affected the length of his overall sentence" even though the prisoner was also sentenced to 10 days in isolation and 20 days in segregations. *Jenkins, supra* at 25 & 27.

That the *Stone–Bey* decision may be questioned generally was noted by the Second Circuit in *Jenkins* when, after joining the D.C. Circuit in holding "that a § 1983 suit by a prisoner ... challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards*" it wrote that "[t]he only other circuit court to have considered the question in a published opinion, the Seventh Circuit, initially came to a different conclusion, *see Stone–*

---

7. The parties did not assist the Court in discussing any relevant Seventh Circuit precedent on this issue.

8. Indeed, this was the distinction made by the Second Circuit post-*Edwards* in *Jenkins, su-*

*pra.* That is, a prisoner's due process challenge to "the validity of a disciplinary or administrative segregation sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards.*"

*Bey* ..., but in three recent opinions, that court has recognized that ... its earlier decision will have to be reconsidered." *Id.* at 27 (citing, *Hoard v. Reddy,* 175 F.3d 531, 532–33 (7th Cir.1999); *Carr v. O'Leary,* 167 F.3d 1124, 1127 (7th Cir. 1999); *Sylvester v. Hanks,* 140 F.3d 713, 714 (7th Cir.1998)). The specific applicability of *Stone–Bey* to this case (where the inmate had no right to appeal his removal from work release and left jail prior to this suit) may also be questioned for as Chief Judge Posner pointed out in *Carr,* 167 F.3d at 1127, "[a] majority of the Justices of the Supreme Court have said that a prisoner who cannot challenge the validity of his conviction (or, what for these purposes is the same thing, a prison disciplinary sanction) by either appeal or postconviction procedure can do so by bringing a civil rights suit for damages under 42 U.S.C. § 1983."

Given the lack of any clear authority to the contrary, this Court is of the view that the weight of authority supports the proposition that *Heck* and *Edwards* do not bar plaintiff's present claim. Although a conclusion that they do would result in dismissal without prejudice, the effective result in this case would be the same since this Court is of the view that defendants are entitled to judgment in any event. Hence, the Court now turns to the merits.

■ "A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of the state." *Asquith v. Department of Corrections,* 186 F.3d 407, 409 (3d Cir.1999) (citing, *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Here, plaintiff claims that state law provided him a liberty interest and even if it did not he had such an interest in continuing work release (or at least procedural protections prior to removal) under the Due Process Clause.

As support for his claim that state law provided him a liberty interest plaintiff points to I.C. 35–38–2.6–5 which provides:

Sec. 5 If a person who is placed under this chapter violates the terms of the placement, the court may, after a hearing, do any of the following:

(1) Change the terms of the placement.

(2) Continue the placement.

(3) Revoke the placement and commit the person to the department of corrections for the remainder of the person's sentence.

Based on that language, plaintiff claims he "has a liberty interest in work release because the Indiana General Assembly, Senate and Governor created one" and as such a "liberty interest is created by the clear legislative intent of our elected officials who thought it important enough to create a statutorily created liberty interest in work release." (Pf.Br.P.8).

■ However superficially appealing that argument is, it misconstrues the applicability of the statute. Statutes must be read *in pari materia.* The language excerpted by plaintiff appears in a Chapter titled "Direct Placement in Community Corrections Program" and relates to a "community corrections program" which is "a program consisting of residential and work release, electronic monitoring, day treatment or day reporting that is: (1) operated under a community corrections plan of a county and funded at least in part by the state subsidy ... or (2) operated by or under contract with a court or county." I.C. 35–38–2.6–2. Importantly, the statute then goes on to provide that "the court may, at the time of sentencing, suspend the sentence *and order a person to be placed in a community corrections program as an alternative to commitment to the department of corrections.*" I.C. 35–38–2.6–3(a) (italics added).

Here that did not occur. In the sentencing order, plaintiff was specifically sentenced "to 1½ years at the Indiana Department of Corrections, plus 1½ years at the Indiana Department of Corrections for aggravating circumstances." After suspending one-half the sentence, the judge indicated that the sentence could be "served at the Grant County Jail with the

defendant on work release, subject to the approval of the Grant County Sheriff." Hence it can in no way be said that plaintiff was sentenced to serve his time in a community corrections program—indeed even his work release status was subject to the approval of the sheriff—such that he was entitled to the protections afforded in I.C. 35–38–2.6–5.

Because plaintiff was sentenced to the Department of Corrections, his reliance on *Davis v. State*, 669 N.E.2d 1005 (Ind.App. 1996) is misplaced. In that case, the Indiana Court of Appeals held that the plaintiff should have been given a hearing before his placement in home detention was revoked and he was transferred to the Indiana Department of Corrections. In reaching that conclusion, the court took pains to point out that the sentencing order was specific and "speaks for itself. The sentencing order committed Davis not to the Indiana Department of Corrections but to the county corrections program of either work release or home detention." *Id.* at 1008.

In the present matter, the sentencing order was equally clear, albeit the opposite—plaintiff was sentenced to the Department of Corrections but allowed, at the Sheriff's discretion to serve his time in the work release program at the Grant County Jail. Given the sentencing order, I.C. 35–38–2.6–5 simply cannot be read as granting him any due process rights to a hearing prior to his removal from the work release program.

Apart from that statute, plaintiff also asserts that this Court's decision in *Smith v. Stoner*, 594 F.Supp. 1091 (N.D.Ind.1984) established a liberty interest in continued participation in a work release program absent a predeprivation hearing. In *Smith*, the plaintiff was sentenced to the Noble County Work Release Program as a part of his conviction for causing death while driving under the influence. In work release, Smith left the confines of the jail and returned at the conclusion of his shift. Smith was removed from the program after violating some rules of the program but that removal was without the benefit of a hearing. This court while recognizing that Smith was lawfully incarcerated, nevertheless concluded that he retained a "greater residuum of liberty than the customary prisoner incarcerated facility" and that this established a liberty interest. *Id.* at 1106.

A lot has happened in the intervening decade-and-a-half since the undersigned penned the decision in *Smith*, not the least of which was the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). There the Supreme Court held that liberty interests do not arise under the due process clause unless the conduct of the government official imposes an atypical hardship in relation to ordinary prison life. As such, the imposition of 30 days of solitary confinement, when compared with the inmate's overall prison environment was not "the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at 485, 115 S.Ct. at 2301.

A number of courts relying upon *Sandin* have found that removal from work release programs do not impose atypical hardships on the inmate in question. For example, in *Dominique v. Weld*, 73 F.3d 1156 (1st Cir.1996), the First Circuit found that the revocation of work release did not implicate a state-created liberty interest under the standard set forth in *Sandin*. In that case, the inmate had been on work release for almost four years during which he was allowed to become a mechanic and open his own repair shop. When his participation in the program was revoked he was transferred to a medium security institution without receiving a written statement concerning his removal. After expressing "some sympathy for plaintiff's complaint," the First Circuit wrote:

> ... [T]he federal courts are not authorized by law to second-guess the policies of prison administrators in a general sense. The question assigned to us is whether the plaintiff had a liberty interest in remaining in work release status,

such that under the Fourteenth Amendment he was entitled to due process of law before that privilege could be revoked. We are constrained to agree with defendants that the new threshold test articulated in *Sandin* precludes our finding a liberty interest and bars relief.

As in *Sandin*, the state's action here did not in any was affect the duration of Dominque's state sentence.

*Id.* at 1160.

Relying in part on *Dominique*, the Eighth Circuit in *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 669–70 (8th Cir.1996) held that an Iowa inmate "did not have a constitutionally protected liberty interest in remaining in the work release program" specifically given the fact that "there was no indication in the record that the duration of Mr. Callender's sentence was in any way affected by the revocation of his work release status." Further, in the post-*Sandin* decision in *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir.1995), the Fifth Circuit "join[ed] the other circuits in holding that a [federal] prisoner does not have a legitimate claim of entitlement to continuing UNICOR employment" since "any expectation that [the inmate] might have had in keeping his UNICOR prison job does not amount to a property interest entitled to due process protection."

Given the reasoning of those decisions, this Court also concludes that present plaintiff did not have a liberty interest in remaining in the work release program such as to entitle him to due process protections prior to his removal from the program. In reaching this conclusion, the Court has thoroughly analyzed the cases presented by the plaintiff which theoretically could support an opposite conclusion but finds them inapposite.

In support of his position, plaintiff relies upon the Second Circuit's decision in *Kim v. Hurston*, 182 F.3d 113 (2d Cir.1999) (plus three cases from district courts in that circuit[9]) and the Tenth Circuit's decision in *Harper v. Young*, 64 F.3d 563 (10th Cir.1995). Both of those cases are different from the case *sub judice* in that the plaintiffs were not incarcerated but were participating in a work release program while living outside prison walls.

This is a distinction with a substantial difference. As noted by the Second Circuit in *Kim*, "[t]he work release program in which Kim participated, *at least the final phase in which she lived at home and worked at a job ... is virtually indistinguishable from ... traditional parole*" and hence "[w]hile participating in this phase ... Kim enjoyed a sufficiently 'serious hardship' to require compliance with at least minimal procedural due process." *Kim, supra* at 188.

In *Young*, (which no party in the instant litigation bothered to point out was affirmed two years ago by the Supreme Court in a published decision, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997)), the plaintiff was, without any procedural due process, removed from preparole status—a status which entitled him to live and work outside prison walls.[10] The Tenth Circuit found this to be violative of due process but in doing so specifically noted: "*Edwards [v. Lockhart*, 908 F.2d 299 (8th Cir.1990) ], we think, correctly identifies the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest: *it is the fact of release from incarceration.*" *Harper* at 566 (emphasis added).[11]

---

**9.** *Greaves v. State of New York*, 951 F.Supp. 33 (S.D.N.Y.), *Roucchio v. Coughlin*, 923 F.Supp. 360, 374 (E.D.N.Y.1996) and *Quartararo v. Catterson*, 917 F.Supp. (E.D.N.Y.1996).

**10.** As explained by the Supreme Court, which affirmed the Tenth Circuit's conclusion that preparole was sufficiently akin to parole such that an inmate was entitled to the procedural protections in *Morrissey v. Brewer*, 408 U.S.

471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), "[h]e kept his own residence, he sought, obtained and maintained a job and he live a life generally free of the incidents of imprisonment." 117 S.Ct. at 1152.

**11.** The Tenth Circuit went on to write:

The liberty associated with a life outside the walls of a penal facility dwarfs that avail-

■ This Court agrees with what appears to be the present majority opinion on the issue.[12] Where, as here, plaintiff is in a work release program at the discretion of the sheriff and is required to reside in the jail at the times when he is not at work, he has no liberty interest in remaining in such a program such that due process requires an opportunity to be heard prior to his removal from the program, at least to the extent that such a removal does not have an impact on the length of his incarceration.[13] Accordingly, defendants are entitled to summary judgment.

■ Even if the foregoing is incorrect, summary judgment nevertheless is appropriate with respect to defendant Nevil because he is entitled to qualified immunity. "Qualified immunity shields the officers from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sledd v. Lindsay,* 102 F.3d 282, 287 (7th Cir.1996) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "The inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996). A two step analysis is employed: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994). "[P]laintiff bears the burden of showing that the officer violated a clearly established constitutional right...." *Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir.1996).

Here, plaintiff has not met his burden, particularly considering that qualified immunity "gives public officials the benefits of the doubt." *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). " 'Closely analogous cases, those decided before the defendant acted or failed to act, are required to find that a constitutional right is clearly established.'" *Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir.1993) (quoting, *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988)). Moreover, " '[f]or qualified immu-

able to an inmate. "It is the freedom to 'be gainfully employed,' 'to be with family and friends,' and 'to form the other attachments of normal life.' ... It is the ability to reside in a home or one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens."
64 F.3d at 566 (citation omitted).

12. The three cases out of districts in New York upon which plaintiff also relies are of no further help. Of critical importance in two of those cases, *Roucchio* and *Graves* was the fact that the prisoners in the work release program were living outside the prison walls five days a week. The continued validity of the third, *Quartarora,* may be in doubt given the Second Circuit's emphasis in *Kim* on plaintiff's liberty interest in her remaining in work release during the final phase of the program where she lived at home and worked at a job.

13. Plaintiff's argument in segue about his placement in isolation as opposed to the general population does not alter this conclusion. As was aptly explained in *Dominique:*

As in *Sandin,* the state's action here did not in any way affect the duration of [plaintiff's] state sentences.... Additionally, his transfer to a more secure facility subjected him to conditions no different from those ordinarily experienced by large numbers of other inmates serving sentences in customary fashion. In *Sandin,* the Supreme Court observed that conditions in the segregated confinement at issue 'mirrored those conditions imposed upon inmates in administrative and protective custody.' ...

It is true there is a considerable difference between the freedoms [plaintiff] enjoyed when he was in work release status and the conditions of incarceration at a medium security facility. To return from the quasi-freedom of work release to the regimentation of four wall may be said, relatively speaking, to have been a 'significant' deprivation. Nonetheless, confinement within four walls of the type plaintiff now endures in 'an ordinary incident of prison life.' It is not 'atypical.'
*Dominique,* supra at 1160. So too here.

nity to be surrendered, preexisting law must dictate, that is, truly compel ... the conclusion for every-like situate, reasonable government agent that what [he] is doing violates federal law in the circumstance.' " *Khuans v. School District 110,* 123 F.3d 1010, 1019 (7th Cir.1997) (quoting, *Lassiter v. Alabama A. & M. Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994)).

As the preceding discussion makes clear, it can hardly be said that the preexisting law dictated or truly compelled a conclusion that plaintiff possessed a liberty interest in continued participation in the work release program. Hence defendant Nevil is entitled to qualified immunity which, after all, is an "accommodation for reasonable error ... because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

### *Conclusion*

On the basis of the foregoing, the Motion for Summary Judgment filed by the defendants on September 9, 1999 is GRANTED. JUDGMENT shall be entered in favor of the defendants and against the plaintiff.

SO ORDERED.