James O. PAIGE, Sr. Plaintiff,

v.

Sheila HUDSON, et al., Defendants.

No. CIV.01–CV–332.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 5, 2002.

James O Paige, Sr., Fort Wayne, IN, pro se.

Laura L. Reuss, Beers, Mallers, Backs, Fort Wayne, IN, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

After *pro se* Plaintiff James Paige ("Paige") was arrested for an alleged pro-

bation violation, he initiated the present civil rights lawsuit alleging due process violations against Defendants Sheila Hudson ("Hudson"), Director of the Allen County Community Corrections ("the ACCC") and various ACCC employees, including Kenneth Scheele, Marcus Hatcher, Karen Dowdell, Stan Pfleuger, and Myrna Greene (hereafter, "the Community Corrections Defendants"). In addition, Paige sued Allen County Sheriff James A. Herman, and his deputies/employees Mark Vachon, Della Logan Hall, Christ Oldfield, Vicki Stonebraker, and S. Walley (hereafter, the Jail Defendants") for alleged constitutional deprivations during his three-day stay at the Allen County Jail.

Presently before the Court are three Motions for Summary Judgment filed by the various parties in this case. Plaintiff James Paige ("Paige") filed the initial motion for summary judgment on August 12, 2002. Shortly thereafter, on August 22, 2002, the Defendants filed two separate motions for summary judgment. All of these motions are fully briefed and ready for adjudication. For the following reasons, the Defendants' Motions for Summary Judgment will be GRANTED. Paige's Motion for Summary Judgment will be DENIED.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). A scintilla of evidence in support of the non-moving party's posi-

tion is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## FACTUAL BACKGROUND

Paige is a 56 year old veteran. In the early 1980's, Paige was diagnosed as a paranoid schizophrenic by the VA and, since August 1992, he has been continually receiving disability benefits from the VA. Aside from paranoid schizophrenia, Paige states that he has an elevated heart rate and high blood pressure.[1]

In July 1998, Paige was sentenced to eight years imprisonment following his conviction for dealing in cocaine, possession of cocaine, and possession of marijuana. Subsequently, Paige's sentence was modified to include two years of probation. As a special condition of his probation, Paige was permitted to serve six months in the Allen County Community Corrections Home Detention program ("Home Detention program").

The Home Detention program is a program wherein participants are permitted to reside outside of the confines of the jail subject to electronic monitoring. Participants are confined to their home at all times except when reporting to and from approved activities such as employment and places pre-approved by the ACCC staff. Participants agree not to possess weapons or controlled substances and to otherwise maintain good behavior. Similarly, participants consent to regular searches of their residence and submit to urinalysis tests upon demand. Participants must obtain full-time employment within thirty days of intake. A participant may be relieved of the full time employment requirement in certain limited circumstances such as if the participant is physically or mentally unable to perform work. If the participant claims that he is unable to work based upon a physical or

1. He was diagnosed with lung cancer in the mid–1970s but has been in remission since approximately 1978.

mental impairment, the participant is required to provide medical documentation demonstrating this fact.

On December 29, 2000, Paige reported to probation officer Anthony Smith to begin his time in the Home Detention program. During this initial meeting, Paige signed an "Order of Probation" which stated, in pertinent part, that Paige "shall be employed full-time and support [his] dependents." (Paige Depo. p. 68 and Exhibit G thereto).

Subsequently, on January 4, 2001, Paige met with Defendant Myrna Greene ("Greene"), a Placement Coordinator and Probation Officer employed by the ACCC to begin the intake process for the Home Detention program. At this meeting, Paige explained that he is disabled and unable to work. He also informed Greene that he draws a disability pension from the VA. Greene instructed Paige that he would either need to provide proof of disability or become employed full-time within 30 days.

A few days later, Victor Slayton, another ACCC employee (not a defendant herein), visited Paige's residence for pre-screening and to explain the policies and rules of the Home Detention program. During that visit, Paige read and signed three documents pertaining to the Home Detention program. Paige signed a "Community Corrections Participant Agreement," in which he agreed to abide by all rules and policies of the ACCC, an "Employment and Financial Agreement," in which Paige stated that he understood that he must be employed full-time within 30 days of intake into the Home Detention program or face termination from the program, and a "Work Program Agreement" in which Paige agreed that if he was unemployed he would be required to work on the Commu-

nity Service Work Crews for 40 hours per week until full-time employment was obtained.[2]

On January 11, 2001, Paige met again with Greene to complete the intake process. Greene reiterated to Paige that he must provide proof of disability to avoid the full-time work or community service requirement of the program. Paige informed Greene that he had been to the VA hospital but did not have any paperwork to support his claim of disability.

On January 23, 2001 and again on January 30, 2001, Paige met with his caseworker, Karen Dowdell ("Dowdell"). At both of these meetings, Dowdell explained to Paige that he was required to provide proof of his disability claim or become employed full-time no later than February 11, 2001. On February 6, 2001, Paige met Dowdell a third time and explained that he had attempted to obtain documentation of his disabilities from the VA and was told that he would need to submit a written request for the information. Paige informed Dowdell that once the VA had his written request, it would take thirty (30) days to receive the information.

After talking with Paige, Dowdell scheduled a Conduct Adjustment Hearing to obtain an extension of time for Paige to obtain the documentation of his disability from the VA. At the same time, Dowdell provided Paige with a document entitled "Notice of Conduct Adjustment Hearing" ("the Notice"). The Notice contains a list of the ACCC's standards of operations for hearings and lists ten (10) rights granted to participants during the hearing. Among the rights listed in the Notice are (1) the right to have 24 hours advance written notice of the hearing; (2) the right

---

**2.** A participant may only work on the Community Service Work Crews for 30 days since that is the time frame within which a partici-

pant is required to obtain full-time employment.

to have an impartial decisionmaker (comprised of three board members[3]) decide the charges based on the evidence presented; (3) the right to call witnesses and present evidence; (4) the right to have the assistance of a lay advocate; and (5) the right to have a written statement of the findings of fact, the evidence relied upon and the reasons for the action taken. Paige's signature appears on the Notice.

Paige appeared at his Conduct Adjustment Hearing on February 7, 2001. The hearing panel consisted of only two members, Defendants Stan Pfleuger ("Pfleuger"), a Reentry/Transitions Coordinator for the ACCC, and Greene. At that hearing, Paige was provided an extension until February 21 to provide the required proof of disability.[4]

The record reflects that Paige wrote several letters to several different agencies attempting to receive medical documentation of his disability. On February 20, 2001, Paige met with Greene again and provided her with three letters from the VA all of which indicate that Paige receives monthly disability pension payments from the VA.[5] The letters also provided a contact person and telephone number in the event that there were any questions about Paige's disability pension. After reviewing these letters, Greene did not believe they provided sufficient evidence of disability because the documents did not provide any information on what Paige's disability was or prove that he suffered

from disabilities which would prohibit him from working. Greene did not take an additional step of telephoning the contact person listed in the letters to obtain additional information on Paige's behalf.

Thereafter, on February 21, 2001, Paige was summoned to a second Conduct Adjustment hearing to discuss his failure to comply with the full-time employment requirement of the Home Detention program. Again, the hearing board consisted of only two members in violation of ACCC policy. Defendants Kenneth Scheele, Operations Director/Controller for ACCC and LeMarcus Hatcher, caseworker, served on the hearing panel.

At the hearing, Paige provided evidence of several handwritten letters to the VA requesting information about his disabled status. In addition, Paige submitted the three letters he had previously provided Greene showing that he received a monthly disability pension from the VA. Paige also asked if Dr. Marc Barnes ("Barnes"), a psychologist employed by ACCC, could speak on his behalf. The panel refused this request because (1) Barnes was not present at the hearing and no arrangements had been made for his presence there and (2) Barnes is not a medical doctor or psychiatrist competent to speak to the alleged medical conditions claimed by Paige. Paige did not have the benefit of a lay advocate to assist him in this proceeding.[6]

---

**3.** Paige has also submitted a document entitled "Allen County Community Corrections Hearing Board Standards of Operation" which appears to be part of a handbook for ACCC. This document provides that the hearing board shall consist of three impartial members—a chair and two other members.

**4.** Why Paige was only provided an additional 10 days to provide the documentation is unclear. Paige stated that it would take at least

thirty days for the VA to respond to his written request.

**5.** One letter, dated February 13, 2001, states as follows: "This is to certify that James O. Paige receives $775.00 monthly benefits for pension based on permanent and total rating for non service connected disabilities effective 12/1/2000."

**6.** Paige does not assert however, that he asked for such an advocate and was refused.

The panel determined that Paige had not met the conditions of the Home Detention program because he did not obtain full-time employment within 30 days of intake or present satisfactory proof of disability. In making this determination, the panel considered Paige's own testimony regarding his inability to work and the letters he submitted from the VA The panel determined that the VA documents did not prove that Paige was disabled and that his disability foreclosed him from seeking employment. The panel also noted that Paige had been physically able to work on the home detention work crew without incident from his date of intake until the February 21 hearing. Paige was informed of the panel's determination and instructed that he should report to his probation officer.

On February 28, 2001, a Verified Petition for Revocation of Probation was filed in Allen Superior Court and a warrant was issued for Paige's arrest. Paige was arrested on March 7, 2001, taken to the lockup and eventually transported to the Allen County Jail. Paige was incarcerated until March 9, 2001 when he was released on bond. These three days in the Allen County Jail form the basis of Paige's complaint against the sheriff and jail officials, discussed *infra*.

A hearing on Paige's probation revocation was held on March 27, 2001. Paige obtained counsel Daniel Pappas (a former defendant herein) to defend him. Prior to the revocation proceeding and with the aid of Pappas, Paige obtained documentation from the VA showing the specific medical conditions for which Paige receives his disability pension. Paige provided this information at the revocation hearing and his probation was not revoked. Paige was permitted to return to the Home Detention Program with his same intake date and with the same completion date he had prior to the revocation proceeding. Paige completed Home Detention on July 11, 2001.

### Paige's Stay at the Allen County Jail

As noted, Paige was incarcerated in the Allen County Lockup on March 7, 2001 and eventually transported to the Allen County Jail until he posted bond on March 9, 2001. When Paige was booked into the Allen County Lockup, he did not have his medications with him and was advised that he would need to have a family member deliver them to the jail. According to Paige, at the time of his arrest, he was taking arthritis medication, high blood pressure medication, and pain killers.

Paige was temporarily housed in the lockup which Paige described as "crowded." Paige stated that he had to sit on the floor and that "considering the crowded conditions, you had to wait until somebody would get up off the floor to even lay down." (Paige Dep. p. 28).[7] Paige was served meals while in the lockup. Paige chose not to eat the meals, however, because he believed the food offered was not part of his prescribed diet. Apparently, Paige was on a physician ordered "no salt diet."[8]

---

He points out only that he did not have an advocate.

**7.** While he was waiting for transport to the jail, Paige complained that he was experiencing dizziness and headaches. The record does not reflect that Paige was given any medical treatment for his dizziness or headaches before being transferred to the jail two or three hours later. Paige did not have any

medical incident related to the headaches or dizziness while at the lockup. Paige claims that his dizziness occurred because he had not received his medication.

**8.** As defense counsel is quick to point out, it is not evident that Paige actually followed the special diet. Paige testified that the morning of his arrest, he ate a "garbage breakfast"

After his transport and arrival at the jail, Paige was able to take a shower and was issued a standard jail uniform. Paige was housed in an individual cell with two other people. The cell was equipped with two bunks, a toilet, and a wash basin. Paige was issued a mattress and hygiene materials, including soap.

Paige claims that his son brought his medication to the jail on the evening of March 7 but that he was denied that medication. Paige also continued to refuse the jail food claiming that it did not comport with his prescribed diet. Paige did not, however, provide any medical documentation to jail officials supporting his claim that he is on a restricted diet.

On the morning of March 8, Paige was called to sick call to see a nurse so that he could sign consent forms for the jail to receive his medication orders from his physician. The nurse informed Paige that his own medications that his son had provided to the jail could not be distributed to him because they were opened and not in secure packaging.[9] Later in the day, Paige received all of the medication he was supposed to receive according to his VA prescription records. All told, Paige missed two doses of his medication.

Based upon the above facts, Paige sued the Community Corrections Defendants claiming that he was denied due process when they terminated him from the home detention program. Paige also sued the Jail Defendants claiming that he was subjected to cruel and unusual punishment while housed at the jail.

## DISCUSSION

Section 1983 is not a source of substantive rights but instead provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994). To prevail on a claim under section 1983, plaintiff must therefore show "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996). The parties appear to concede that the defendants acted under color of law and thus, the only remaining question is whether genuine issues of material fact exist relating to the constitutional violations. The court turns first to the claims against the Community Corrections Defendants.

### Fourteenth Amendment Claims against the Community Corrections Defendants [10]

The Fourteenth Amendment provides that states may not deprive persons of "life, liberty, or property" without due process of law. Of great consequence to the due process analysis is whether plaintiff's allegations show a deprivation of a property or liberty interest. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)(holding that analysis of a due pro-

---

consisting of bacon and ham fried with eggs and potatoes at Powers Restaurant.

9. For security reasons, the jail has a policy of requiring all medications to be in unopened, secure packaging.

10. To the extent that Paige's complaint can be read to assert claims of cruel and unusual punishment against these Defendants, such a claim clearly fails. Paige has made no allegations that any of the Community Corrections Defendants was personally involved in any of the alleged instances of cruel and unusual punishment to support an individual capacity claim. Likewise, the Allen County Community Corrections has no control over actions taken at the jail to support an official capacity claim.

cess claim begins with determining whether the plaintiff has a liberty or property interest with which the state has interfered); *Zorzi v. County of Putnam*, 30 F.3d 885 (7th Cir.1994). "A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of the state." *Weller v. Grant County Sheriff*, 75 F.Supp.2d 927 (N.D.Ind.1999). Once an individual claiming a due process violation establishes that he has a protectable liberty interest, the court must determine what procedural safeguards are required to protect that interest. *Williams v. Lane*, 851 F.2d 867, 880 (7th Cir.1988). The focus of the Community Corrections Defendants' motion is on the first step, that is, they claim that plaintiff had no liberty interest in his continued placement in the community corrections program. Paige, however, claims that Indiana state law provided him a liberty interest and, even if state law did not, the internal rules and policies of Allen Community Corrections provide him with a liberty interest in his continued placement in the Home Detention program.

The Community Corrections defendants focus on Indiana statutory provisions which permit placement in a community corrections program in two ways. Under these statutes, a defendant may be ordered directly into a community corrections program at the time of sentencing in lieu of commitment to the department of correction, i.e., a direct placement, Ind. Code § 35–38–2.6–1. Otherwise, Ind.Code § 35–38–2.5 permits placement in a home detention program as a condition of probation subject to supervision by the probation department of the court or by a community corrections program. In the case of a direct placement, Ind.Code § 35–38–2.6–5 provides that placement in a community corrections program may only be revoked by a court after notice and a hearing. Thus, in the case of a direct placement, the Community Corrections defendants agree that state law has provided defendants with a "liberty interest" in their continued placement in a community corrections program.

According to the Community Corrections defendants, however, the same result cannot be said to flow from placements in community corrections programs occurring as a condition of probation, which is how Paige entered the Community Corrections Program. Contrary to direct placements, there is no express statutory provision for notice and a hearing when the placement in a community corrections program occurs as a condition of probation. Rather, the Community Corrections defendants note that Ind.Code § 35–38–2–3 states that a court may revoke a person's probation, after a hearing, if the person violates a condition of probation. Thus, in the defendants' view, under state law, when a person violates a condition of probation, such as the terms of his placement in a community corrections program, the person is entitled to a hearing prior to a probation revocation, not prior to termination from a community corrections program. Accordingly the defendants' position is that the state has created a liberty interest only in Paige's probation status, not in his continued placement in a particular program as a condition of that probation.

■ This court agrees with defendants that Paige was absolutely entitled to due process before his probationary status could be revoked. Indeed, probation revocation implicates the defendant's liberty interests which entitles him to some procedural due process. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972). But,

Paige does not complain that he did not receive all the process he was due with respect to the probation revocation proceeding, nor would the record support such a contention. Rather, Paige's particular concern is the lack of process afforded him before he was terminated from the home detention program which ultimately led to the probation revocation proceeding and his three day incarceration. Thus, the particular question Paige presents is, does a defendant have a liberty interest in remaining in a program that is a condition of probation and which could ultimately adversely affect his continued probationary status, so as to require, at the very least, minimal due process requirements before termination from the program?

This question is not a simple one to resolve, particularly in light of the Supreme Court's holding in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin*, the Supreme Court concluded that liberty interests do not arise under the due process clause unless the conduct of the government official imposes an atypical hardship in relation to ordinary prison life. This holding has led to two separate lines of cases addressing the issue of whether a liberty interest exists in participation in a work release program.[11] A number of cases have held that prisoners on work release have a liberty interest in continued participation in such programs. See *Friedl v. City of New York*, 210 F.3d 79 (2d Cir.2000); *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir.1999); *Tracy v. Salamack*, 572 F.2d 393, 395–96 (2d Cir.1978) (per curiam). In contrast, two cases have, under *Sandin*, rejected the contention that once an inmate has been given work release he thereby acquires a liberty interest

in retaining that status. See *Dominique v. Weld*, 73 F.3d 1156 (1st Cir.1996); *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666 (8th Cir.1996).

A discussion in the undersigned's decision in *Weller v. Grant County Sheriff*, 75 F.Supp.2d 927 (N.D.Ind.1999) further muddies the water with respect to whether Paige would have a liberty interest in continuing in the home detention program. In *Weller*, this court determined that a prisoner did not have a liberty interest in a temporary work release program where he was required to reside at the jail at all times when he was not participating in work release and his continued service in the work release program was subject to the discretion of the sheriff. In reaching this conclusion, the undersigned analyzed several of the above-noted cases. See *Kim v. Hurston*, 182 F.3d 113 (2d Cir.1999) (liberty interest in work release program where defendant lived at home and worked at a job); *Harper v. Young*, 64 F.3d 563 (10th Cir.1995), affirmed, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997) (liberty interest exists in a defendant's preparole status where defendant permitted to live and work outside prison walls). In both of *Kim* and *Harper*, the courts found that the release from incarceration and the ability to live and work outside of prison walls was the critical factor that permitted a conclusion that a liberty interest existed such that minimal due process requirements must be met. As the Tenth Circuit noted, "the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest [is] the fact of release from incarceration." *Harper*, 64 F.3d at 566. That court went on to write:

**11.** There are some distinctions between a work release program and the home deten-

tion program.

The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate. It is the freedom to "be gainfully employed," "to be with family and friends," and "to form the other enduring attachments of normal life." ... It is the ability to reside in a home of one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens. The passage outside the walls of a prison does not simply alter the degree of confinement; rather, it works a fundamental change in the kind of confinement, a transformation that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections outlined in *Morrissey*.

*Id. (internal citations omitted).* Because Weller remained incarcerated when he was not in the work release program, the undersigned concluded that he had no liberty interest in his continued participation in that program since it did not affect the length of his incarceration. *Weller*, 75 F.Supp.2d at 934 ("Where, as here, plaintiff is in a work release program at the discretion of the sheriff and is required to reside in the jail at the times when he is not at work, he has no liberty interest in remaining in such a program such that due process requires an opportunity to be heard prior to his removal from the program, at least to the extent that such a removal does not have an impact on the length of his incarceration.").

In this case, unlike in *Weller* and several of the cases discussed therein, Paige was authorized to participate in the home detention program as a special condition of probation and was permitted, with restrictions, to live and work outside of prison walls. Under the rationale of the *Harper* and *Kim* cases discussed in *Weller*, Paige seemingly has a liberty interest in his continued participation in the home detention program. This said, the Community Corrections defendants repeatedly emphasize that Paige's termination from the home detention program did not automatically result in a revocation of Paige's probation and a return to incarceration. However, neither did the program which created a liberty interest in *Harper*. Indeed, the program in *Harper* is markedly similar to the home detention program in this case in that the program in *Harper* released defendants into society conditionally subject to special restrictions such as maintaining full-time employment, remaining drug and alcohol free, on-demand urine testing, and frequent reporting to a probation officer. *Harper*, 64 F.3d at 565. Participants in the *Harper* program were instructed that violation of one of the special restrictions *may* result in termination from the Program and a return to incarceration. In light of these similarities, the court sees no substantial difference between the program in *Harper* and the home detention program in this case.[12] Fortunately, however, the court needn't definitively answer this question today.[13] For, even if the

---

12. Paige also claims that the ACCC created a liberty interest in his continued participation in home detention through the promulgation and distribution of standards of operations for Conduct Adjustment Hearings which informed participants that they had certain rights at such hearings. The Community Corrections defendants claim that such standards are mere administrative regulations and do not create a liberty interest in remaining in a particular program.

13. The Community Corrections Defendants also assert that Paige received at least minimal process before terminating him from the Home Detention program even though all of the ACCC Standards of Operation were not met. In light of the qualified immunity analysis, this court need not make address this issue.

court gives Paige the benefit of the doubt and assumes the existence of a liberty interest, the law is sufficiently unclear on the point so as to make summary judgment appropriate with respect to the Community Corrections defendants under the doctrine of qualified immunity.

"Qualified immunity shields the officers from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sledd v. Lindsay*, 102 F.3d 282, 287 (7th Cir.1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "The inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996). A two step analysis is employed: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir.1994). "[P]laintiff bears the burden of showing that the [defendants] violated a clearly established constitutional right...." *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996).

Here, plaintiff has not met his burden, particularly considering that qualified immunity "gives public officials the benefits of the doubt." *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir.1991), cert. denied, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). " 'Closely analogous cases, those decided before the defendant acted or failed to act, are required to find that a constitutional right is clearly established.'" *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir.1993) (quoting, *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988)). Moreover, " '[f]or qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel ... the conclusion for every-like situate, reasonable government agent that what [he] is doing violates federal law in the circumstance.'" *Khuans v. School District 110*, 123 F.3d 1010, 1019 (7th Cir.1997) (quoting, *Lassiter v. Alabama A. & M. Univ.*, 28 F.3d 1146, 1150 (11th Cir.1994)).

As the preceding discussion makes clear, it can hardly be said that the preexisting law dictated or truly compelled a conclusion that plaintiff possessed a liberty interest in continued participation in the home detention program. For this reason, the Community Corrections defendants are entitled to qualified immunity with respect to Paige's due process claim against them. Accordingly, the Community Corrections defendants Motion for Summary Judgment is GRANTED. Paige's Motion for Summary Judgment is DENIED.

### Claims Against Jail Defendants

With respect to his stay at the Allen County jail, Paige alleges that the conditions of his confinement were deplorable, such that they violated his Eighth Amendment guarantee against cruel and unusual punishment. The Jail Defendants have moved for summary judgment claiming that Paige has not submitted any evidence to support the contention that the Jail Defendants violated his rights.

As a general rule, prison officials are responsible for providing the "basic necessities of civilized life." *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir.1989). This does not mean, however, that prisons or jails need be comfortable, *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), and, in fact, "[i]nmates cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988). In determining whether liability should arise, a court must look at "the evolving standards of decency

that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)).[14] The Eighth Amendment imposes on prison officials the duty to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). However, prison conditions violate the Eighth Amendment only in those cases where a prisoner is deprived of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

■ For liability to attach in this case, Paige must satisfy a two-prong test consisting of an objective component and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Vance v. Peters*, 97 F.3d at 987, 991 (7th Cir.1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). As has been indicated by the Seventh Circuit:

> To satisfy the objective component, the deprivation alleged must be, objectively, sufficiently serious. Therefore, extreme deprivations are required to make out a conditions-of-confinement claim. The subjective component relates to a defendant's state of mind and requires a showing of deliberate indifference. At a minimum ... an inmate must allege actual knowledge of impending harm easily preventable. A failure of prison officials to act in such circumstances

suggests that the officials actually want the prisoner to suffer the harm. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir.2001). With respect to the subjective prong—which requires a showing of deliberate indifference—the Supreme Court has explained that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970, 128 L.Ed.2d 811.

■ Paige claims that because of overcrowding he was required to sleep on a floor mattress rather than a bunk, that he was not provided his special diet, and that he was denied his medications for one day. However, the record presented even when viewed in the light most favorable to Paige fails to establish that the deprivations alleged are objectively, 'sufficiently serious' or that the Defendants intentionally or negligently deprived him of the basic necessities of life to the degree that a jury could find an Eighth Amendment violation. *See Vance*, 97 F.3d at 991.

Indeed, "[s]leeping on a mattress on the floor, without aggravating circumstances (e.g., no mattress, low temperature without blankets, unreasonable vermin infestation), is not of constitutional magnitude." *Robeson v. Squadrito*, 57 F.Supp.2d 642, 646 (N.D.Ind.1999) (citing cases). Likewise, there is no evidence that the defendants intentionally deprived Paige of his medi-

---

**14.** Conditions of confinement claims brought by pre-trial detainees at county jails are evaluated under the Due Process Clause of the Fourteenth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 534–35, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979), while those brought by convicted prisoners are evaluated under the Eighth Amendment. The rights of a pre-trial detainee are at least as great as those afforded to convicted felons, and accordingly, Eighth Amendment jurisprudence is often utilized to evaluate claims regarding conditions of confinement whether they be brought by pre-trial detainees or prisoners. *Payne v. Churchich*, 161 F.3d 1030, 1041 (7th Cir.1998); *Mathis v. Fairman*, 120 F.3d 88, 91 n. 3 (7th Cir.1997); *Zarnes v. Rhodes*, 64 F.3d 285, 289 (7th Cir. 1995) (pretrial detainees retain at least those constitutional rights that are enjoyed by convicted prisoners).

cations or knew that Paige was on a restricted diet and deliberately ignored the restriction. While Paige does submit a document from his physician showing that he was on a "no salt diet," Paige does not assert that he provided this information to the Jail Defendants or that they otherwise had medical documentation of a restricted diet and ignored it. With respect to his medications, Paige only missed two doses of his medications and the Jail Defendants acted quickly to obtain his prescriptions from his physician and dispense them to Paige. Thus, construed most favorably to Paige, the record does not even suggest that any actions of the Jail Defendants were sufficiently serious to constitute an Eighth amendment violation or that the Jail Defendants were negligent and/or deliberately indifferent to any of Paige's medical needs. For this reason, the Jail Defendants' Motion for Summary Judgment is GRANTED. Paige's Motion for Summary Judgment is DENIED.

### CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment (Docket # 113 and Docket # 115) are GRANTED. Plaintiff's Motion for Summary Judgment (Docket # 109) is DENIED. The Clerk shall enter judgment in favor of the Defendants.[15]

---

15. In closing, the court would be remiss if it failed to note that Paige presents a sympathetic case. All of this legal wrangling (spanning 6 volumes and 131 docket entries) could have been avoided if the ACCC had aided Paige in securing the requisite documentation from the Veteran's Administration. Paige clearly made attempts to satisfy the ACCC that he was disabled (he certainly provided evidence that he was receiving a disability pension from the VA) and to secure the proper information from the VA. The record is full of letters Paige wrote to various agencies seeking the appropriate verification of his disability. In the end, Paige's lawyer, with the benefit of one telephone call and one follow-up letter, received the information sought by the ACCC so as to permit Paige to be returned to the home detention program. Of course, this help came only after Paige had been arrested for a probation violation and spent three days in the Allen County Jail.